In re John ROE,[1] Debtor.

John ROE, Plaintiff,

v.

THE LAW UNIT; Student Loan Corporation; United Student Aid Funds, Inc.; Pennsylvania Higher Education Assistance Agency; Graduate Loan Center FLSC, Defendants.

Bankruptcy No. 97–04416–TOM–7.
Adversary No. 7–00408.

United States Bankruptcy Court,
N.D. Alabama,
Southern Division.

Sept. 4, 1998.

1. The names of the Debtor and the Debtor's spouse have been changed for the purpose of publishing this opinion.

Bruce A. Burttram, Burttram & Henderson, Birmingham, AL, for Debtor.

Debra B. Winston, Birmingham, AL, for United Student Aid Funds, Inc.

Patricia Y. Comer, Birmingham, AL, for Pennsylvania Higher Education Assistance Authority.

## MEMORANDUM OPINION AND ORDER

TAMARA O. MITCHELL, Chief Judge.

This proceeding came before the Court on Debtor's complaint seeking to discharge student loans. Appearing at the June 16, 1998 trial and at the July 23, 1998 status conference[2] were Bruce A. Burttram, attorney for

---

2. After presenting their evidence at trial and pri- or to making closing arguments, the parties

the Debtor, Debra B. Winston, attorney for United Student Aid Funds (hereafter "USA"), and Patricia Y. Comer, attorney for Pennsylvania Higher Education Assistance Agency (hereafter "PHEAA"). This Court has jurisdiction pursuant to 28 U.S.C. § 1334(b) (1994)[3] and the district court's General Order Of Reference Dated July 16, 1984, As Amended July 17, 1984.[4] This is a core proceeding arising in a case under Title 11 of the United States Code as defined in 28 U.S.C. § 157(b)(2)(I) (1994).[5] This Court has considered the pleadings, testimony and documentary evidence, the arguments of counsel, and the law. In accordance with Federal Rule of Civil Procedure 52,[6] applicable to adversary proceedings in bankruptcy pursuant to Federal Rule of Bankruptcy Procedure 7052,[7] this Court makes the following findings of fact and conclusions of law:

## I. FINDINGS OF FACT

### (A) Incurrence of the Student Loan Debts

The Debtor testified that his parents paid for his undergraduate degree in political science from the University of Alabama at Birmingham and for his first semester at Cumberland School of Law. In order to finance the remaining cost of his juris doctorate degree, Debtor incurred five student loan debts between 1988 and 1991. (Pl.'s Ex. 2, Def.'s Ex. 5)[8] The first of these loans was executed on August 9, 1989 for $7,056.00 granted by Mellon Bank, and guaranteed by and subsequently assigned to PHEAA, a state agency (hereafter "unconsolidated loan"). (Pl.'s Ex. 3) On September 1, 1990, Debtor obtained a loan for $4,000.00 from Ameritrust Company National Association (hereafter "Ameritrust") to pay for the cost of his Alabama State Bar examination[9] (hereafter "Bar loan"). (Pl.'s Ex.3, Def.'s Ex. 6) This Bar loan was subsequently assigned to PHEAA. (Pl.'s Ex. 3, Def.'s Ex. 6) Additionally, on May 13, 1991, Debtor applied for and received a consolidation loan of $17,615.17 from Citibank (hereafter "consolidation loan" or "consolidated loan") to pay off four other student loans: two loans from Ameritrust, one loan from Mellon Bank, and one loan from Samford University. (Pl.'s Ex. 2, Def.'s Ex. 5) This consolidation loan was subsequently assigned to USA. (Pl.'s Ex. 2, Def.'s Ex. 5)

### (B) History of Employment

Debtor testified to the following events since graduating from law school. After

agreed to a two-week continuance to attempt a private resolution of this dispute without mediation. After a further continuance was unsuccessful at resolving the dispute, the parties appeared at the July 23, 1998 status conference where each of them submitted a Proposed Terms for Final Order to the Court in lieu of presenting closing arguments.

3. **28 U.S.C. § 1334(b)** provides:

Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11 or arising in or related to cases under title 11.

4. The **General Order of Reference Dated July 16, 1984, As Amended July 17,**

**1984** issued by the United States District Court for the Northern District of Alabama provides: The general order of reference entered July 16, 1984 is hereby amended to add that there be hereby referred to the Bankruptcy Judges for this district all cases, and matters and proceedings in cases, under the Bankruptcy Act.

5. **28 U.S.C. § 157(b)(2)(I)** provides:

(b)(2)Core proceedings include, but are not limited to—
(I) determinations as to the dischargeability of particular debts.

6. **Fed.R.Civ.P. 52 Findings by the Court; Judgment on Partial Findings** provides:

(a) In all actions tried upon the facts without a jury...the court shall find facts specially and state separately its conclusions of law thereon, and judgment shall be entered pursuant to Rule 58...

7. **Fed. R. Bankr.P. 7052, Findings by the Court** provides:

Rule 52 F.R. Civ. P. applies in adversary proceedings.

8. Prior to trial, the parties stipulated to the admission of Plaintiff's Exhibits 1 through 11 and Defendant's Exhibits 1 through 24 and Exhibit 26. During the trial, Defendant's Exhibits 27 through 33 were admitted without objection from Plaintiff.

9. Debtor testified that he also sat for the ethics portion of the Georgia State Bar.

passing the Alabama State Bar exam in 1991, he was unsuccessful in obtaining employment with a law firm. He worked primarily as a solo practitioner between September of 1991 and April of 1994 where 75% of his practice was court-appointed work. Debtor divorced in 1992 and remarried in March of 1994. At that time, he decided to close his law practice and join the Navy. In April of 1994, he received a tentative admission date, but subsequently was disqualified for admission into the Navy based on his medical records.

In the Spring of 1994, Debtor was evicted from his office for failure to pay rent and later his car was repossessed by GMAC. In addition, the Alabama State Bar suspended his license to practice law for 91 days for failing to notify five of his clients that he had closed his practice. The Debtor testified that the cost as of January of 1998 to have his license reinstated by the Bar was $4,300.00, which included a reinstatement fee of $500.00 and $3,800.00 payable to the Alabama Client Security Fund for a damages claim paid out to one of the five clients.

After the Debtor closed his practice and was unable to join the Navy, the Debtor enrolled at UAB starting with the Fall quarter of 1994 to pursue an undergraduate degree in mechanical engineering while his father-in-law helped pay living expenses for Debtor's family. Subsequently, when he had completed two-and-one-half years of credit toward a mechanical engineering degree, his father-in-law became unable to continue providing financial support for Debtor and his dependents. Thus, in September of 1995, Debtor quit attending school and, with his father-in-law's help, obtained a general laborer position at Pelham Fluid Power, Inc. where his father-in-law was a shop manager. Debtor's starting rate of pay was $6.00 per hour and he worked between forty and fifty hours each week. (Def.'s Ex. 4) Debtor was subsequently promoted to mechanic and in 1997 received several raises which increased his wages from $7.75 per hour to $9.50 per hour. (Def.'s Ex. 4) He was later promoted again to supervisor of the mechanic shop and began earning $11.00 per hour. (Def.'s Ex. 4) Debtor testified that in March of 1998, he was fired by the owner of Pelham Fluid for failing to warn the owner that Debtor's father-in-law planned to quit his job as shop manager. However, a March 3, 1998 memo to Debtor's personnel file written by the owner reflected: 1) that the owner had spoken with Debtor about his "poor work habits," including "excessive phone calls, idle time, and an unwillingness to change on his part," and 2) that Debtor "agreed that 3/5/98 would be his last day of employment." (Def.'s Ex. 4) Furthermore, Debtor's attendance history reflects that he was late getting to work on 66 days during 1997. (Def.'s Ex. 4).

Debtor's current resume reflects that he is "engaged in a variety of temporary positions to earn income while simultaneously looking for full-time employment." (Pl.'s Ex. 5) Debtor stated that he performs yard work for his mother and that he has been working temporarily as a law clerk for his counsel, Bruce Burttram. Debtor also testified that he has sought permanent employment by applying with law firms and insurance companies, by interviewing with temporary and permanent employment services, and by answering advertisements for employment in newspapers circulated in Atlanta, Birmingham, Mobile, Nashville, and Raleigh–Durham. He stated that upon learning that his license to practice law is suspended, potential employers typically refuse to interview him further.

According to their jointly filed federal tax returns, Debtor's wife, Ms. Roe (hereafter, "Ms. Roe") worked as a bookkeeper for Action Industries, Inc. during 1994 and 1995. (Def.'s Ex. 17 and 18). She testified that in 1996 she began working as a beautician at Options, a hair salon. She said that when Options closed in January of 1998, she went to work in February or March at another salon, Hair Styles. She testified that she does not have a cosmetology license, although she does have the minimum 3,000 working hours required in order to obtain one. Ms. Roe further stated that two weeks prior to trial, she began working from 9:00 a.m. to 7:00 p.m. on Tuesdays, Wednesdays, and Thursdays, and from 9:00 a.m. to 6:00 p.m. on Saturdays. However, Ms. Sue Hale, the owner of Hair Styles salon, testified that

during the week preceding trial Ms. Roe only worked three days from 3:30 or 4:00 p.m. until 7:00 p.m. Further, Ms. Hale stated that she had not seen Ms. Roe working the additional hours Ms. Roe claimed to have worked during the two weeks prior to trial. No additional evidence was offered thus presenting conflicting testimony regarding the hours worked by Ms. Roe. This Court finds that Ms. Hale's testimony regarding the hours Ms. Roe works is more credible because she is not a party to this proceeding, but rather is an objective, uninvolved witness who appears to have no potential financial interest in the outcome.

### (C) History of Income

On June 19, 1997, Debtor filed his Chapter 7 petition with this Court. Debtor's Schedule I—Current Income of Individual Debtor(s) reflected that Debtor was divorced with two dependents, ages two and five years. (Pl.'s Ex. 1) Debtor testified that he had to file as divorced because at that time the state court judge had set aside his wife's divorce decree. Ms. Roe had initiated proceedings to annul provisions in her divorce decree from her prior husband concerning her award of $298.00 in child support and her ex-husband's custody rights so that Debtor could adopt her five-year-old daughter by this prior marriage. (See Def.'s Ex. 26) Subsequently, after the filing of their petitions, the Debtor and his wife remarried. Thereafter, the Debtor completed his adoption proceedings regarding this child on June 4, 1998. Also on June 19, 1997, Ms. Roe filed a separate voluntary Chapter 7 petition, Case No. 97–04417–BGC–7. (Def.'s Ex. 3) Schedule I in her petition reflected that her marital status was "separated," and that she claimed the same two dependents as Debtor. (Def.'s Ex. 3)

The following table illustrates information about income for Debtor and his wife as reflected in Debtor's payroll records and federal income tax returns for 1996 and 1997 (Pl.'s Ex. 10, Def.'s Ex. 4, 15, and 16), Debtor's Schedule I filed on June 19, 1997 (Pl.'s Ex. 1, Def.'s Ex. 2), Schedule I filed on June 19, 1997 by Ms. Roe in her separate bankruptcy case (Def.'s Ex. 3), and a listing of sources for net income as of June 5, 1998 (Pl.'s Ex. 7) as well as testimony given by Debtor and Ms. Roe at trial about their income as of June 16, 1998.

| DATE | AMOUNT | WHOM | EXHIBIT(S) | SOURCE |
|---|---|---|---|---|
| Average per month, 1996 | $1,405.00 gross [10] | His | Def.'s Ex. 16 Pl.'s Ex. 10 | 1996 IRS tax return |
| Month of April 1997 | $1,408.76 gross 1,131.23 net | His | Def.'s Ex. 4 | Payroll records |
| Month of May 1997 | $1,815.28 gross 1,278.66 net | His | Def.'s Ex. 4 | Payroll records |
| May 25—June 19, 1997 | $1,458.05 gross [11] 1,086.43 net [12] | His | Def.'s Ex. 4 | Payroll records |
| June 19, 1997 Monthly income | $1,228.00 gross 1,028.00 net | His | Pl.' s Ex. 1, Def.'s Ex. 2 | Schedule I of Bankr. Petition |
| June 19, 1997 Monthly income | $ 750.00 gross 750.00 net | Hers | Def.'s Ex. 3 | Schedule I of her Bankr. Pet. |
| June 19, 1997 Monthly income | $1,000.00 gross | Hers | None | Testimony of Debtor's wife |
| Average per month, 1997 | $1,646.00 gross [13] | His | Def.'s Ex. 15 | 1997 IRS tax return |

10. Debtor's gross annual income on his 1996 federal tax return was listed as $16,852.01. Debtor filed a separate return from his wife.

11. Debtor's payroll records reflect that he was paid weekly. Total gross income for the four weeks ending May 29, June 5, June 12, and June 19 was $1,458.05. If this four weeks of income was recalculated to reflect an average monthly income, then the result would be $1,579.56.

12. This represents four weeks of net income, but if this were recalculated to reflect an average net monthly income then the result would be $1,116.28.

13. Debtor's gross annual income on his 1997 federal income tax return was listed as $19,-752.54. Debtor filed a separate return from his wife.

| DATE | AMOUNT | WHOM | EXHIBIT(S) | SOURCE |
|------|--------|------|------------|--------|
| February 1998 [14] | $2,142.26 gross 1,734.12 net | His | Def.'s Ex. 4 | Payroll records |
| June 16, 1998 | $2,100.00 net | His | Pl.'s Ex. 7 [15] | Debtor's testimony |
| June 16, 1998 | $1,200.00 net of business expenses [16] | Hers | Pl.'s Ex. 7 | Testimony of Debtor, wife |
| Total income June 19, 1997 | $2,458.05 gross [17] 1,836.43 net [18] | Both | Def.'s Ex. 4 | Payroll records Debtor's wife |
| Total income June 16, 1998 | $3,300.00 net | Both | Pl.'s Ex. 7 | Testimony of Debtor, wife |

The data in this table reflects that Debtor and Ms. Roe understated their gross incomes on Schedule I of their respective bankruptcy petitions. Gross income was $1,228.00 and net income was $1,028.00 on Debtor's Schedule I. However, Debtor's gross and net incomes for May 25—June 19, 1997, the four weeks preceding Debtor's bankruptcy filing, were higher—$1,458.05 gross and $1,086.43 net. Debtor's average gross income for 1996 of $1,405.00 and for 1997 of $1,646.00 provide additional evidence that Debtor understated his gross income on Schedule I. The Court concludes that Debtor's gross and net monthly incomes at the time he filed bankruptcy were at least $1,458.05 gross and $1,086.43 net, rather than the $1,228.00 gross and $1,028.00 net listed on his petition.

Further, Ms. Roe testified at trial that her gross monthly income, including tips, was $1,000.00 when she worked at Options hair salon. Since she was working at Options when she filed her bankruptcy petition reflecting gross income of only $750.00, the Court also concludes that Ms. Roe was grossing $1,000.00 per month before business deductions rather than the $750.00 listed on Schedule I of her petition.

Debtor's testimony and list of sources of net monthly income as of June 5, 1998 reflect that today Debtor has even more disposable income to contribute toward his family's expenses and repayment of his student loan debts than at the time he filed for bankruptcy. Although Debtor currently takes home only $1,000.00 monthly from his temporary employment, his mother contributes approximately $1,100.00 monthly toward his children's daycare expenses.[19] Thus, under the best case scenario, this results in $2,100.00 [20]

14. Debtor's last full month of employment at Pelham Fluid Power, Inc. prior to his termination on March 5, 1998.

15. Debtor's trial exhibit reflecting income and expenses as of June 5, 1998.

16. This is supported by Debtor's testimony as to business deposits his wife has made to a checking account she opened in November of 1997. Assuming Debtor's statements are accurate, his wife's business deposits to this account averaged $1,236.00 monthly between December 1997 and March 1998 after deducting the amount of checks Debtor wrote to his wife out of his account.

17. The sum of Debtor's actual gross income between May 25 and June 19, 1997 ($1,458.05) and the $1,000.00 gross income Ms. Roe earned in tips and wages, according to her testimony.

18. The sum of Debtor's net income between May 25 and June 19, 1997 ($1,086.43) and his wife's net income of $750.00.

19. Debtor testified that he performs yard work for his mother to repay her for the $1,100.00, and he therefore considers the $1,100.00 to be part of his earned income. However, Debtor also testified that if his wife quit working to stay home with their daughters thereby eliminating daycare expenses, his mother would not pay the $1,100.00 to him for performing yard work. The Court finds it questionable and curious that Debtor's mother would rather pay a daycare service to babysit Debtor's children than to pay Debtor's wife the $1,100.00 to raise her own children.

20. The result of $1,000.00 from Debtor's employment plus $1,100.00 from his mother.

net income for Debtor's family. This is much higher than the $1,028.00 net income as of June 19, 1997 reflected in Debtor's bankruptcy schedules. Furthermore, net monthly income earned by Ms. Roe increased from $750.00 at the time she filed her bankruptcy petition to $1,200.00 as of June 5, 1998. The Court thus finds that total potential net income for Debtor and his wife has increased substantially over approximately one year from $1,973.61 to $3,300.00.

### (D) History of Expenses

The table on the following pages illustrates information about expenses for Debtor and his wife. Sources of data for each expense item in Column 1 include: Schedule J filed in Debtor's bankruptcy case on July 9, 1997 (Pl.'s Ex. 1, Def.'s Ex. 2), which is identical to the one filed in his wife's separate case; copies of canceled checks and checking account statements dated January 1997 through October 1997 for two accounts at National Bank of Commerce held by Ms. Roe and copies of canceled checks and bank statements dated October 1997 through April 1998 for an account at National Bank of Commerce opened in October 1997 by Debtor (Def.'s Ex. 27–32); Debtor's trial exhibit listing expenses as of June 5, 1998 (Pl.'s Ex. 7).

| Regular Monthly Expense Item | July 9, 1997 Schedule J (Pl.'s Ex. 1) | Banking records Average 1/97—4/98 (Def.'s Ex. 27–32) | June 5, 1998 (Pl.'s Ex. 7) |
|---|---|---|---|
| Rent | $ 721 | $ 530 [21] | $ 748 |
| Electricity | 100 | 61 | 90 |
| Telephone | 40 | 31 | 50 |
| Cable | $ 0 | $ 15 | $ 20 |
| Auto payments [22] | 263 | 228 | 277 |
| Cellular phone, Pager | 300 [23] | 106 [24] | 0 |
| Auto Transportation [25] | 100 | 33 | 100 |
| Food [26] | 400 | 318 [27] | 500 |

**21.** Between January and May 1997, Debtor and his wife paid to Debtor's father-in-law, Tom Ingram, $1,100.00, for an average of $220.00 per month. Because Debtor testified that his father-in-law had been helping them with their living expenses and because there were no checks made payable to a landlord between January and May of 1997, the Court has attributed this money toward rent. From June 1997 through April 1998, canceled checks made payable to Wellington Manor Apartments reflect that Debtor's average monthly rent payments jumped to $700.00.

**22.** The payments are for a 1996 four-door Kia Sephia purchased by Ms. Roe on June 3, 1996. (Def.'s Ex. 3)

**23.** Although Defendant's Exhibit 31 includes a photocopy of a check for $322.79 dated May 19, 1997 and made payable to Powertel, a cellular phone company, Defendant's exhibits reflect that not only was this the largest check written to Powertel it was also approximately three times the amount of the average monthly check written between January and December of 1997 to creditors providing cellular phone and pager services.

**24.** Debtor's canceled checks and bank statements reflect that no payments were made to providers of cellular phones and pagers after December of 1997. The $106.00 is thus an average between only January and December of 1997.

**25.** Included are expenses for car maintenance and gasoline. However, monthly payments on automobile loan payments are listed as a separate expense category.

**26.** Included in the Food category are checks written to restaurants and grocery stores. Although some cash withdrawals and checks made payable to cash from Ms. Roe's checking accounts could have been used to pay for food, the Court notes that when Debtor opened his checking account in November 1997 to, as he stated, monitor his family's budget, cash withdrawals and checks made payable to cash virtually ceased and Debtor began making checks payable to his wife. Debtor and his wife both testified that these checks made payable to her were deposited to her separate checking account which she testified to maintaining for business deposits. Thus it is reasonable to conclude that Ms. Roe was using cash withdrawals and checks made payable to cash primarily to pay business expenses rather than for food expense.

**27.** All checks written to restaurants and grocery stores could be accounted for only between Janu-

| Regular Monthly Expense Item | July 9, 1997 Schedule J (Pl.'s Ex. 1) | Banking records Average 1/97—4/98 (Def.'s Ex. 27–32) | June 5, 1998 (Pl.'s Ex. 7) |
|---|---|---|---|
| Medical and Dental . | $ 200 | $ 40[28] | $ 220[29] |
| Daycare[30] | 0[31] | 440 | 370[32] |
| Clothing | 100 | 7 | 20 |
| Laundry and Cleaning | 0 | 2 | 20 |
| Newspapers, Books | 0 | 0 | 10 |
| Alimony, Child Support | 100[33] | 0 | 0 |
| Recreation[34] | 0 | 42 | 50 |
| Health Insurance | 48 | 0 | 32 |
| Auto Insurance | $ 55 | $ 53 | $ 80 |
| Total Debtor's Regular Expenses | $2,427 | $1,906 | $2,587 |

ary 1997 and October 1997, so this monthly average is for that period only. For the months of June and July 1997, when both Debtor and his wife filed their bankruptcy petitions and expense Schedule J, the total amount of checks written to restaurants and grocery stores was even lower than the $318.00 monthly average: $315.34 for June and $120.07 for July. However, the Court notes that checks written to restaurants comprised 34% of Debtor's total food expenses between January and October of 1997.

28. This result is the monthly average for all checks made payable to physicians, drug stores, and pharmacies during the period when all such checks could be accounted for, January 1997 through October 1997. All checks made payable to "Kmart" (as opposed to "Kmart Pharmacy") and other general food or merchandise stores are not included in this category.

29. Debtor testified that at the time of this trial, he pays $150.00 monthly for medicine to treat his ulcer and associated gastrointestinal reflex, he pays $50.00 monthly for his wife's antidepressants, and he pays $20.00 monthly for their children's medicines, for a total of $220.00 per month. He further stated that in the past he had to purchase two nebulizers at a cost of $70.00 each to alleviate breathing problems experienced by Nickey, his three-year-old daughter, which have gotten better since she was an infant. The Court notes, however, that his checking account history fails to corroborate his testimony.

30. These average daycare payments do not include any money that Debtor's mother may have paid to daycare services for Debtor's two natural daughters.

31. Debtor testified that he failed to list any daycare expenses on Schedule J because he did not see anywhere to list them, although the Court notes that there is a catch-all category for "Other" expenses on his Schedule J and that the amount filled in for this item was "$0.00."

32. According to Debtor's testimony, these daycare expenses are for Debtor's adopted daughter.

33. Debtor testified that the $100.00 listed for alimony, maintenance, and support for others on his Schedule J was an amount for another expense that was listed in the wrong place. However, he did not elaborate on the nature of this $100.00 expense.

34. This expense category includes alcoholic beverages, toys, gymnastics, and television rental.

| Regular Monthly Expense Item | July 9, 1997 Schedule J (Pl.'s Ex. 1) | Banking records Average 1/97—4/98 (Def.'s Ex. 27–32) | June 5, 1998 (Pl.'s Ex. 7) |
|---|---|---|---|
| Business Expenses [35] | $ 0 [36] | $ 498 [37] | $ 0 [38] |
| Daycare paid by Debtor's mother | 0 | 0 | 1,100 [39] |
| Attorneys, P.I. [40] | 0 | 162 [41] | 0 |
| Total All Expenses | $2,427 | $2,566 | $3,687 |

As the table illustrates, several of the regular monthly expenses for Debtor's family were overstated on Schedule J filed in his bankruptcy case when compared with his family's average monthly expenses as reflected by bank records for the period January 1997 and April 1998. Specifically, payments by check for rent, electricity, telephone, cellular phones and pagers, food, automobile gasoline and maintenance, medical and dental needs, and car loan payments totaled $777.00 less per month than the amounts Debtor had listed on his Schedule J.[42] In addition, Debtor had no alimony or child support payments, contrary to what is indicated on his Schedule J. At the same time, Debtor failed to disclose on his Schedule J daycare expenses, his wife's business expenses, and expenses associated with his wife's divorce modification and Debtor's adoption proceedings. Debtor's payment history between January 1997 and April 1998 reflects lower amounts for monthly expenses than Debtor's testimony and trial exhibit dated June 5, 1998. Further, Debtor offered no evidence to explain these differences.

The Court finds that Debtor's evidence regarding his regular expenses at the time of trial is not consistent with the documentary evidence [43] and thus is not credible. The Court further finds that, at the time of trial, regular monthly expenses for Debtor's family approximate $1,906.00, the average for January 1997 through April 1998. If daycare expenses paid for by Debtor's mother are added to this, Debtor's total monthly ex-

35. These are business expenses paid by Ms. Roe, including for office rent and beauty supplies purchased from Kmart, Walmart, and beauty supply stores. Checks written to Kmart and Walmart were included in business expenses because Debtor testified that his wife had worked steadily since 1996 as a beautician and that it was not unusual for her to make purchases twice in one day from Kmart and Walmart. Also included are cash withdrawals and checks made payable to cash.

36. Schedule J in the petition filed by Ms. Roe reflected "$0.00" for "Regular expenses from operation of business, profession, or farm."

37. All checks written to Kmart, Walmart, and beauty supply stores could be accounted for only during the months of January and October 1997, so $498.00 is the monthly average is for that period. Testimony given by Ms. Sue Hale, owner of the hair salon where Ms. Roe works, reveals that at the time of trial Debtor's wife pays $125.00 weekly in office rent to Ms. Hale, or approximately $500.00 monthly.

38. Since Pl.'s Ex. 7 does not list business expenses for Ms. Roe and since Ms. Roe testified that she currently earns $1,200.00 monthly net of her business expenses, no business expenses are shown here.

39. Debtor testified that since the last part of 1997 or early 1998, his mother has been paying approximately $1,100.00 monthly toward daycare expenses for his two natural daughters to attend a daycare facility close to his mother's home.

40. This category includes payments made to attorneys and a private investigator in connection with bankruptcy petitions filed by Debtor and his wife as well as divorce modification and adoption proceedings initiated by Ms. Roe.

41. All checks written to attorneys J. Massey Relfe and Bruce Burttram, and to Lloyd Anderson, whom Debtor testified was a private investigator, totaled $970.00 between February and July 1997.

42. Checks for rent, electricity, telephone, cellular phones and pagers, food, automobile transportation and loan payments, and medical and dental bills totaled $1,347.00. The total for these expenses listed on Debtor's Schedule J was $2,124.00. The difference is $777.00.

43. The Court notes that Debtor cannot be classified or categorized as an unsophisticated debtor. He has an undergraduate degree, a juris doctorate degree, and two-and-one-half years toward completing a mechanical engineering degree. The Court has to presume that the Debtor could have reviewed and /or consulted his own payroll

penses are $3,006.00 ($1,906.00 plus $1,100.00). This Court has already determined that current net monthly income for Debtor and his wife is $3,300.00, including daycare payments made by Debtor's mother and after Debtor's wife has paid for her business expenses. Therefore, Debtor's family realizes a current monthly surplus of approximately $294.00 ($3,300.00—$3,006.00).

### (E) Debtor's Student Loan and Practice Loan Payments

Debtor testified to the following events. In 1991, Debtor obtained a $30,000.00 personal loan from First Alabama Bank to finance the start-up costs of his solo practice. His father was a co-signer on this loan. Subsequently, his father repaid this $30,000.00 loan.

Between 1991 and 1992, Debtor applied for and received all possible forbearances on his student loan payments. Between late 1992 and April of 1994, Debtor managed to "break even" in his practice while making irregular monthly payments on his unconsolidated loan and Bar loan and making a few payments on his consolidation loan. Debtor made loan payments to Defendants only during the period he practiced law. The following table provides a summary of Debtor's payment history on each of these loans.

| STUDENT LOAN | EXHIBITS | DATES PAID | AMOUNT PAID |
|---|---|---|---|
| PHEAA unconsolidated loan | Pl.'s Ex.4, Def.'s Ex. 7 | 9/92—12/93 | $1,289.35 |
| PHEAA Bar loan | Pl.'s Ex. 3, Def.'s Ex. 8 | 12/91—12/93 | 1,250.19 |
| USA consolidation loan | Pl.'s Ex. 4 | 10/92—3/93 | 411.71 |

### (F) Current Status of Debtor's Student Loans

The following table reflects the current status of each of Debtor's student loans pursuant to the parties' stipulation.

| STUDENT LOAN | EXHIBITS | INTEREST RATE | BALANCE |
|---|---|---|---|
| PHEAA unconsolidated loan | Pl.'s Ex.3, Def.'s Ex. 6 | 3.25% plus the Current Index rounded to the nearest .125% (1/8 of 1%) | $11,847.80 [44] |
| PHEAA Bar loan | Pl.'s Ex. 3, Def.'s Ex. 8 | Unknown | 4,423.15 [45] |
| USA consolidation loan | Pl.'s Ex. 4 | 9.00% | 35,765.19 [46] |
| TOTAL | | | $52,036.14 |

Additionally, the parties stipulated at the beginning of trial that the unconsolidated loan, the four loans that were consolidated as well as the consolidation loan, and the Bar loan were educational loans made, insured, or guaranteed by a governmental unit as described in 11 U.S.C. § 523(a)(8)(1994). The parties further stipulated that each of these loans first came due within less than seven (7) years before the date that Debtor filed his current Chapter 7 petition.

records, tax returns, bank records and other documentation regarding his family's income and expenses before listing his income on Schedule I and his expenses on Schedule J of his bankruptcy petition, and before listing his income and expenses on Plaintiff's Exhibit 7 for trial.

**44.** As of June 15, 1998.

**45.** As of June 15, 1998.

**46.** As of June 14, 1998.

## II. CONCLUSIONS OF LAW

### (A) Section 523(a)(8)

Congress' main purpose in enacting the Bankruptcy Code was to ensure the insolvent debtor a fresh start by discharging his prepetition debts. *Grogan v. Garner*, 498 U.S. 279, 286, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 54 S.Ct. 695, 78 L.Ed. 1230 (1934)). In furtherance of Congress' fresh start policy, the Eleventh Circuit has generally construed exceptions to discharge narrowly. *Haas v. Internal Revenue Service (In re Haas)*, 48 F.3d 1153, 1158 (11th Cir.1995); *Equitable Bank v. Miller (In re Miller)*, 39 F.3d 301, 304 (11th Cir.1994). However, Congress enacted 11 U.S.C. § 523(a)(8) to ensure that education loans extended by or with the aid of a governmental unit or nonprofit institution solely on the basis of the student's future earnings potential could not be discharged by recent graduates who would then pocket all future benefits derived from their education. *Andrews University v. Merchant (In re Merchant)*, 958 F.2d 738 (6th Cir.1992) (citing H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 466–75 reprinted in 1978 U.S.Code Cong. & Admin. News 5787).

Congress also provided two narrow exceptions to this general rule of nondischargeability of student loans. In the present case, the parties stipulated that each of the Debtor's student loans first became due within less than seven (7) years before the date that Debtor filed his bankruptcy petition, thus making the exception found in 11 U.S.C § 523(a)(8)(A)[47] unavailable to the Debtor. The other exception, found in 11 U.S.C. § 523(a)(8)(B), is for the student loan debtor whose past, present, and future financial picture appears so bleak that repayment of these loans is not feasible. Specifically, 11 U.S.C. § 523(a)(8)(B) provides that a debtor cannot be discharged from:

> any debt—for an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship, or stipend, unless—
>
> ...(B) excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents.

Where, as in the present case, the debtor seeks a discharge of debts pursuant to § 523(a)(8)(B), the creditor bears the initial burden of establishing: (1) existence of a student loan debt, (2) which is owed to, insured by, or guaranteed by a governmental agency or nonprofit institution, and (3) which first became payable less than seven years prior to the date of the filing of the petition.[48] The appropriate standard of proof of the elements in § 523(a)(8) is a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 290, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Once the creditor proves these three elements, the burden of proof then shifts to the debtor to show that repayment of the student loans would impose an undue hardship on him and his dependents.[49] In the present case, PHEAA and USA satisfied

---

**47.** 11 U.S.C. § 523(a)(8)(A) provides that a debtor cannot be discharged from a student loan extended by or with the aid of a governmental unit or nonprofit institution unless "such loan, benefit, scholarship, or stipend overpayment first became due more than 7 years (exclusive of any applicable suspension of the repayment period) before the date of the filing of the petition."

**48.** *Santa Fe Medical Services, Inc. v. Segal (In re Segal)*, 57 F.3d 342 (3d Cir.1995); *Halverson v. Pennsylvania Higher Education Assistance Agency (In re Halverson)*, 189 B.R. 840 (Bankr.N.D.Ala. 1995); *United States v. McGrath*, 143 B.R. 820 (D.Md.1992), *aff'd*, 8 F.3d 821 (4th Cir.1993); *Koch v. Pennsylvania Higher Educ. Assistance Agency (In re Koch)*, 144 B.R. 959 (Bankr. W.D.Pa.1992); *Cadle-Company v. Webb (In re Webb)*, 132 B.R. 199 (Bankr.M.D.Fla.1991); *D'Ettore v. Devry Inst. of Tech. (In re D'Ettore)*, 106 B.R. 715 (Bankr.M.D.Fla.1989); *Coleman v. Higher Educ. Assistance Found. (In re Coleman)*, 98 B.R. 443 (Bankr.S.D.Ind.1989). *See* Raymond L. Woodcock, *Burden of Proof, Undue Hardship, and Other Arguments for the Student Debtor Under 11 U.S.C. § 523(a)(8)(B)*, 24 J.C. & U.L. 377, 393 (1998); Darrell Dunham and Ronald A. Buch, *Educational Debts Under the Bankruptcy Code*, 22 Mem. St. U.L.Rev. 679, 688 (1992).

**49.** *Id.; Pennsylvania Higher Education Assistance Agency v. Faish (In re Faish)*, 72 F.3d 298 (3d Cir.1995), *cert. denied*, 518 U.S. 1009, 116 S.Ct. 2532, 135 L.Ed.2d 1055 (1996); *Woodcock v. Chemical Bank, NYSHESC (In re Woodcock)*, 45 F.3d 363 (10th Cir.1995), *cert. denied*, 516 U.S. 828, 116 S.Ct. 97, 133 L.Ed.2d 52 (1995). The first case to shift the burden to the debtor of proving the "undue hardship" exception to Congress' § 523(a)(8) exception to discharge for student loans appears to have been *Financial Collection Agencies v. Norman (In re Norman)*, 25 B.R. 545 (Bankr.S.D.Cal.1982).

their burden of proof when the Debtor agreed at the beginning of trial to stipulate as to the existence of his student loan debts, that these debts were of the type described in § 523(a)(8), and that each of them first came due within less than seven· (7) years before the date that Debtor filed his current Chapter 7 petition.

The burden of proof at trial was therefore on the Debtor to establish by a preponderance of the evidence that repayment of his student loans would impose an "undue hardship" on him and his dependents. Because the Code does not define "undue hardship," bankruptcy courts have developed tests for strictly interpreting the Congressional intent favoring nondischargeability.[50]

### (B) The Johnson Three–Part Test of "Undue Hardship"

In *Robinson v. United States Department of Education (In re Robinson )*, 193 B.R. 967 (Bankr.N.D.Ala.1996) and in *Stewart v. Alabama Guaranteed Student Loan Program (In re Stewart)*, Case No. 92–08606–TOM–7, A.P. No. 95–00129 (July 14, 1995) this Court adopted the three-part hardship test developed by the court in *Pennsylvania Higher Education Assistance Agency v. Deborah Lee Johnson (In re Johnson)*, 5 Bankr.Ct. Dec. 532, 536–545 (Bankr.E.D.Pa.1979): the mechanical test, the good faith test, and the policy test. Each part of this test is addressed below.

### (1) Part I: The Mechanical Test

■ Under the mechanical test, ·
The court must ask: Will the debtor's future financial resources for the longest foreseeable period of time allowed for repayment of the loan, be sufficient to support the debtor and his dependent[s] at a subsistence or poverty standard of living, as well as to fund repayment of the student loan?

*In re Johnson,* 5 Bankr.Ct. Dec. at 544. To answer this question, the *Johnson* court looked at various indicators of the debtor's future financial resources, including: current rate of pay; past and current wages and salaries earned; marketable employment skills; sex; ability to obtain and retain employment; current employment status; employment record; education; health; access to transportation; small dependent children; sources of income and wealth other than employment. *Id.* at 537–538. The *Johnson* court then compared the debtor's future financial resources to minimal, necessary monthly expenses for a "similarly situated hypothetical debtor" with the same marital status and number of dependents, as well as any non-discretionary "extraordinary expenses." *Id.* at 538. If a surplus exists after making this mechanical comparison of future income and minimized future expenses, the court must determine if the surplus is sufficient to repay the student loans over the longest possible repayment period. *Id.*

In the present case, the Debtor has access to his wife's car for transportation to and from work. Debtor's·rate of pay is $1,000.00 monthly from temporary jobs, but this is substantially less than the $1,734.12 net monthly income he was making as a mechanic shop supervisor as recently as February 1998 (Def.'s Ex: 4) just before he was terminated. At the time he was hired by Pelham Fluid Power, Inc., Debtor's license to practice law was, just as now, suspended pending his payment of the reinstatement fee and demonstrating that he was qualified to practice law. During his two-and-one-half years with this company, Debtor received several promotions. · Debtor presented no evidence of health or mental problems that would

**50.** Two of the tests most frequently cited by bankruptcy courts were developed in *Pennsylvania Higher Education Assistance Agency v. Deborah Lee Johnson (In re Johnson)*, 5 Bankr.Ct. Dec. (CRR) 532 (Bankr.E.D.Pa.1979) and *Brunner v. New York State Higher Education Services Corp.*, 831 F.2d 395 (2nd Cir.1987). The following opinions applied the *Johnson* three-part test: *Howell v. The Education Resources Inst. (In re Howell )*, Case No. 95–70202–CMS–7, A.P. No. 95–70374 (Bankr.N.D.Ala. Jan. 5, 1996); *Berthiaume v. Pennsylvania Higher Educ. Assistance Auth. (In re Berthiaume )*, 138 B.R. 516 (Bankr. W.D.Ky.1992); *Bakkum v. Great Lakes Higher Educ. Corp. (In re Bakkum )*, 139 B.R. 680 (Bankr.N.D.Ohio 1992); *Conner v. Illinois State Scholarship Comm'n (In re Conner )*, 89 B.R. 744 (Bankr.N.D.Ill.1988). The following opinions adopted the *Brunner* test: *Tennessee Student Assistance Corp. v. Hornsby (In re Hornsby )*, 144 F.3d 433 (6th Cir.1998); *Halverson v. Pennsylvania Higher Education Assistance Agency (In re Halverson)*, 189 B.R. 840 (Bankr.N.D.Ala.1995); *Cheesman v. Tennessee Student Assistance Corp. (In re Cheesman )*, 25 F.3d 356 (6th Cir.1994), *cert. denied*, 513 U.S. 1081, 115 S.Ct. 731, 130 L.Ed.2d 634 (1995); *The Cadle Co. v. Webb (In re Webb )*, 132 B.R. 199 (Bankr.M.D.Fla.1991).

suggest he is incapable of obtaining and retaining permanent employment in the future. Given Debtor's extensive post-secondary education, the Court further believes that Debtor's current rate of pay is substantially less than his potential earnings as an attorney, should he seek reinstatement of his law license. In addition, Debtor's mother contributes $1,100.00 monthly toward daycare expenses for Debtor's dependents. Debtor presented no evidence that this is unlikely to continue in the future. Finally, Ms. Roe has substantially increased her monthly earnings from $750.00 *before* business expenses during July of 1997 to $1,200.00 *after* business expenses at the time of trial, approximately one year later. Ms. Roe was able to realize this substantial increase in her income while working only limited hours, according to the salon owner's testimony. Given all of these circumstances, the Court concludes that there is a substantial likelihood that Debtor's present financial resources of $3,300.00 monthly may increase in the future.

Based on the checking account history of Debtor and his wife, the Court earlier concluded that the Debtor's monthly expenses average $3,006.00, leaving a monthly surplus of $294.00 for student loan repayments. However, the Court believes that Debtor's monthly daycare expenses of $1,470.00 are unreasonably high for a "similarly situated hypothetical debtor" with the same income, marital status and number of dependents as Debtor.[51] Further, given the wide variations in housing costs in and around the Birmingham area as well as the wide variation in Debtor's average monthly rent payment history ($220.00 between January and May 1997 of $220.00 and $700.00 between June 1997 and April 1998 [52]) the $748.00 Debtor claims he now pays in monthly rent expense appears subject to being reduced.

Additionally, the $1,100.00 monthly support Debtor receives from his mother in daycare payments could be used more resourcefully. Assuming Debtor's wife quit working even for a temporary period and that Debtor's mother would rather pay her daughter-in-law than a daycare service to provide full-time care for her granddaughters,[53] Debtor's current monthly surplus of $294.00 would rise by the difference between his wife's current net income of $1,200.00 and their current daycare expenses of $1,470.00 (i.e., $270.00), to yield a total surplus of $564.00 monthly ($294.00 plus $270.00).

 Because Debtor's payment history for expenses and current income reflect a monthly surplus of $294.00, and because the circumstances indicate that his monthly expenses could be reduced and that his income may increase in the future, Debtor failed to fully convince the Court of his entitlement to a complete discharge under the mechanical part of the *Johnson* three-part test.[54] The Court recognizes that the Debtor's current situation appears on its face to be bleak and financially deficient. However, the Court does not find it appropriate to view the Debtor's financial picture as a snapshot, but prefers instead to view it as a video of the Debtor's situation prepetition and postpetition, as well as post-discharge. In taking this broader view of the financial potential available to the Debtor and his dependents, the Court finds that some leniency is appropriate thus entitling him to a fresh start as opposed to a "head start." *Taylor v. AGE Federal Credit Union (In re Taylor )*, 3 F.3d 1512, 1516 (11th Cir.1993).

### (2) Part II: The Good Faith Test

In assessing the Debtor's good faith, the second part of the *Johnson* test,

> the court asks two questions: (a) Was the debtor negligent or irresponsible in his efforts to minimize expenses, maximize resources, or secure employment? (b) If "yes," then would lack of such negligence

---

**51.** The Court notes that as Debtor's children become old enough to attend school, daycare expenses will decline dramatically.

**52.** See footnote 20.

**53.** Debtor's wife testified at trial that she is in the process of obtaining a substitute teaching certificate so that she can work around and have the same hours as her children's school schedule.

**54.** See section C, Debtor's Repayment Schedule on page 29, *infra*.

or irresponsibility have altered the answer to the mechanical test?

*In re Johnson,* 5 Bankr.Ct. Dec. at 544. Factors that the *Johnson* court considered were whether the debtor utilized any opportunity to reduce his living expenses, whether the debtor has tried to improve his financial plight by taking advantage of every means of financial resource available, and whether the debtor directed his effort toward "securing a job which makes the best use of the debtor's skills and education." *Id.* at 541.

In the present case, the Debtor created additional monthly living expenses as well as failed to take advantage of numerous opportunities to reduce his family's monthly living expenses. First, Debtor completed proceedings on June 4, 1998 to voluntarily adopt his wife's five-year-old daughter from a prior marriage. The net effect of this on Debtor's monthly expenses was three-fold. These legal proceedings cost the Debtor money. They also eliminated his wife's ability to collect past and future child support payments under her divorce decree. In addition, by adopting a third dependent, Debtor reduced the beneficial effect of his bankruptcy discharge from pre-bankruptcy obligations.

Second, the Debtor failed to take every opportunity to minimize his family's exorbitant daycare expenses of $1,470.00 monthly, maximize his ability to produce income, and maximize his wife's resources as a caretaker for his children. Debtor's daycare expenses comprise 49%—approximately half—of Debtor's average monthly expenses of $3,006.00. Yet, based on the credible evidence there appears to be little reason for Debtor's children to attend daycare. Ms. Sue Hale, the owner of the hair salon where Ms. Roe works, testified that Ms. Roe worked between 3:30 and 4:00 p.m. until 7:00 p.m. only three days each week. Ms. Roe holds no other job, although her work history reflects that she does have other marketable job skills. Debtor testified that his mother picks up his two natural daughters from the daycare service that she pays, that later Debtor picks up these daughters from his mother's house each evening after work, and that his mother lives thirty minutes from Debtor's apartment (which adds further expense for

gas and wear and tear on the Kia Sephia vehicle). In addition, Ms. Roe's net monthly income of $1,200.00 is $270.00 less than daycare expenses for all three of her children. If Ms. Roe either kept the children when she is not at work or if she quit working and stayed at home with her children, Debtor's monthly surplus of $294.00 would rise by the $270.00 net reduction in expenses. This Court noted earlier in footnote 18 that it was questionable that Debtor's mother would prefer paying $1,100.00 to a daycare service over paying Debtor's wife the $1,100.00 to stay at home with her granddaughters—especially if the $1,100.00 were necessary to meet living expenses for her grandchildren. Conversely, if Debtor's wife worked a full-time job, she would need to bring home more than $1,470.00 monthly to justify this amount in daycare expenses. Alternatively, if Ms. Roe kept the children and Debtor worked for a third party for the same period of time he allegedly works for his mother to compensate for the $1,100.00 per month in daycare expenses, Debtor's income would be greater.

Third, Debtor's food expenses could have been reduced by eating out less and cooking more at home. This Court noted earlier in footnote 26 that Debtor's checks to restaurants between January and October of 1997 comprised 34% of Debtor's food expenses.

Fourth, Debtor failed to minimize his family's housing expense. As noted earlier in footnote 20, Debtor's monthly rent payments escalated from an average of $220.00 between January and May of 1997 to an average of $700.00 between June 1997 and April 1998. Further, Debtor testified that as of June 5, 1998 his rent had increased to $748.00 monthly. Given the wide variation of housing costs in and around the Birmingham area, Debtor's current monthly rent of $748.00 is subject to being reduced to a monthly payment more reasonable in relation to their current net income and family size.

The credible evidence also shows that Debtor failed to maximize his available resources for enhancing his income. Debtor has a license to practice law and two-and-one-half years of experience as an attorney. During this two-and-one-half year period, Debtor had developed a reputation for his

willingness to accept court appointments to represent clients. His law license would not have been temporarily suspended but for the Debtor's failure to notify five of his clients when he decided to voluntarily close his law practice. In addition, the reinstatement fee would be only $500.00 rather than $4,300.00, but for a claim paid to one of these clients in satisfaction of that client's losses resulting from Debtor's failure to properly communicate with his client. Moreover, Debtor can reinstate his law license with the Alabama State Bar Association, although he apparently had not chosen to do so as of the time of trial. Debtor's reason for failing to reinstate his license was that he could not afford to pay the $4,300.00 required to do so. However, the Court feels compelled to question Debtor's testimony that his mother would not lend him the $4,300.00 necessary to reinstate his license when Debtor also testified that his mother pays $1,100.00 *monthly* toward Debtor's daycare expenses.

Furthermore, the credible evidence shows that Debtor was terminated from his last permanent employment as a supervisor making substantially more money than he currently earns from temporary jobs because of his irresponsible conduct. Copies of documents subpoenaed from Debtor's personnel file reflect that Debtor was frequently late to work, and that the business owner terminated him for his "poor work habits," including "excessive telephone calls, idle time, and an unwillingness to change on his part." Further, Debtor was careless in losing his law license, irresponsible in losing his last permanent job, and thus far has failed to utilize all of his financial resources—including money earned from prior jobs and his mother's willingness to provide his family with monthly support—to reinstate his law license and reestablish himself as a practicing attorney.

Finally, Debtor failed to direct his efforts toward securing employment which makes the best use of his education and job skills. He acquired extensive post-secondary education, including a bachelor's degree in political science, a juris doctorate of law, and two-and-one-half years of college credits toward a bachelor's degree in mechanical engineering. Yet, during the tenure of his last permanent employment relationship, Debtor accepted a starting position as a general laborer making an hourly wage of $6.00, subsequently advanced to a mechanic's position making $7.75 per hour, and later advanced to a supervisory position making $11.00 per hour at the time he was terminated. Debtor also testified that he currently performs yard work for his mother in exchange for the $1,100.00 she pays in monthly daycare expenses for his two natural daughters. Thus, it appears that Debtor is either unable to take advantage of his extensive post-secondary education is or he elects not to take advantage of his education and accepts work performing yard work, general labor, mechanic or supervisory work.

Debtor testified that he has been unable to secure permanent employment with law firms and insurance companies since his termination in March of 1998 primarily because of his suspended law license. However, Debtor also testified during this proceeding that he was working as a law clerk for his counsel in this case, Bruce Burttram. Thus, while suspension of his law license may have hampered Debtor's recent permanent job search, he is still able to secure temporary employment in the field of law due to his education and prior experience as a practicing attorney. Further, should Debtor pay the $4,300.00 and take all other steps required to reinstate his law license, Debtor will likely secure permanent employment utilizing his education and legal skills to earn substantially more than the $1,000.00 monthly he currently earns from temporary work. Alternatively, the Debtor could secure employment as an engineer and perhaps complete his mechanical engineering degree, which would enable him to enhance his career in that field.

To sum up, Debtor has created additional monthly expenses by adopting an additional dependent and he has failed to take steps to reduce daycare, food and housing expenses to amounts more reasonable for his net income and family size. Debtor temporarily lost his license to practice law due to his own carelessness, he was irresponsible in losing his last permanent job, and thus far has failed to utilize any of his financial resources

to reinstate his law license. Since closing his law practice, Debtor has failed to direct his efforts toward securing employment which makes the best use of his legal education and skills acquired as a practicing attorney by accepting blue collar positions paying hourly wages as well as by failing to take steps to reinstate his law license.

The Court further concludes that had the Debtor not lost his law license and/or been able to retain his last permanent position, the mechanical test used in part one for comparing future financial resources to minimal, necessary expenses would have yielded an even greater surplus for repayment of student loan debts. Debtor's present monthly net income of $1,000.00 is substantially less than it would be had he not been terminated from his prior position where his monthly gross income was $2,142.26 and monthly net income was $1,734.12. Furthermore, had Debtor continued practicing as an attorney his monthly net income likely would have exceeded $1,734.12. Thus, looking at the Debtor's past and current employment, income and expenses, as well as taking into consideration his potential for future employment and income and likely expenses, Debtor has failed to convince this Court of sufficient good faith on his part in claiming undue hardship under the second part of the *Johnson* test so as to allow him a complete discharge of his student loan obligations.

■ Pursuant to the test in *Johnson,* if the debtor fails to prove sufficient elements to meet both the mechanical test of undue hardship and the good faith test of undue hardship, then he has failed to demonstrate, without consideration by the Court of the third part of the *Johnson* test, that he is entitled to a discharge of his student loan debts under 11 U.S.C. § 523(a)(8)(B). *In re Johnson,* 5 Bankr.Ct. Dec. at 544. In this case, the Court has found that Debtor's current situation may appear to approach the

parameters of the first two parts of the *Johnson* test, the mechanical and good faith tests. However, the Court has also found that considering the whole picture, including future potential, the Debtor has not shown that he meets the first two tests sufficiently to walk away from approximately $50,000.00 in student loan debts. This finding is even more compelling in light of the third part of the *Johnson* test, the policy test, which the Court discusses below.[55]

### (3) Part III: The Policy Test

■ Under the policy test,

The court must ask: Do the circumstances—i.e., the amount and percentage of total indebtedness of the student loan and the employment prospects of the petitioner indicate: (a) That the dominant purpose of the bankruptcy petition was to discharge the student debt, or (b) That the debtor has definitely benefitted financially from the education which the loan helped to finance?

*In re Johnson,* 5 Bankr.Ct. Dec. at 544. The policy test addresses Congress' intent in enacting section 523(a)(8). Specifically, Congress was concerned that recent college graduates who were extended education loans on the basis of their future earnings ability should not be able to file bankruptcy primarily for the purpose of discharging these loans and thereafter pocketing the benefit derived from the loans. *Id.* at 542–543. Only those debtors who had truly fallen on difficult times after incurring their student loan debts and who would likely never derive any future benefit from the education financed with these loans could qualify for the undue hardship exception. *Id.* In the present case, the parties stipulated at trial that Debtor's total student loan debts were $52,036.14 and that this amount represents 53% of his total debts as of the date of filing bankruptcy.[56] The amount of Debtor's other

---

**55.** The *Johnson* court held that if the debtor fails to meet the elements of the first two parts of the test, the mechanical test and the good faith test, then the court need not consider the third part of the test, the policy test.

**56.** Debtor's Schedules E and F filed on July 9, 1997 reflect total student loan debts of $55,-

102.28 and total debts—all unsecured—of $101,-461.82. (Pl.'s Ex. 1, Def.'s Ex. 2) Thus, student loan debts comprised 55% of Debtor's total debts. At trial, the parties stipulated that total student loan debts were $52,036.14. By substituting the stipulated figure of $52,036.14 for the $55,102.28 listed on Debtor's bankruptcy schedules, student loan debts were 53% of total debts.

major debts at the time of filing bankruptcy included a $24,000.00 debt owed to Bobby N. Floyd, which this court declared dischargeable in a prior adversary proceeding, and $10,252.67 in credit card debts. Because the amount of education debts is substantial and because they comprise more than half of Debtor's total prepetition debts he seeks to discharge, this Court cannot clearly say that discharging his student loan debts was not the Debtor's dominant purpose for filing bankruptcy.

It is clear, however, that Debtor benefitted from the legal education gained as a result of receiving the student loans at issue. He was able to pass the state Bar exam and practice for two-and-one-half years. Further, upon completing the steps to get his license reinstated, Debtor can again enjoy the benefits of his legal education.

■ To sum up, the Debtor appears to have, for the moment, fallen on hard times. However, the fairly large $52,036.14 amount of student loan debts, the fact that these debts comprise 53% of Debtor's total debts, and the likelihood that Debtor will derive future benefit from the education and state bar examinations financed with these loans demonstrate that this Debtor was not the type of debtor that Congress envisioned in enacting 11 U.S.C. § 523(a)(8)(B). Because Debtor failed to meet the requisite proof of elements under the mechanical test, the good faith test, and the policy test for a showing of "undue hardship," he cannot escape complete and total liability for his student loan debts.

### (C) Debtor's Repayment Schedule

■ Bankruptcy courts have exercised wide discretion in modifying the principal, interest, and other charges, as well as in structuring a repayment schedule for student loans found to be nondischargeable in part or in whole.[57] In the present proceeding, Debtor failed to prove to this Court a sufficient showing of undue hardship for a total or

complete discharge of his student loans. Notably, in its proposal for terms of this Court's final order, Defendant PHEAA offered that Debtor be discharged in full from his Bar exam debt, and that the unconsolidated student loan be reduced to a nondischargeable balance of approximately $10,100.00, interest-free for twelve (12) months, and with interest to accrue thereafter at 6.00% per annum during the repayment period. Also, Defendant USA proposed that Debtor's nondischargeable debt on the consolidation loan be reduced from $35,765.19 to $26,000.00, that it remain interest-free for a period of twenty-four (24) months, with interest to accrue thereafter at 7.00% per annum.

The Court presumes that the Defendants proposed the foregoing based upon the fact that at the time of trial Debtor was not employed in the profession he used the loan proceeds to achieve. Like the Defendants, the Court is aware that the financial snapshot reflects that the Debtor is not currently fully utilizing his legal career obtained with these loans. Thus, also like the Defendants, the Court is willing to allow an opportunity for the Debtor to "get back on his feet" so he can benefit from his fresh start. The Court finds that although these debts are not due to be discharged in full, the Debtor has at least made a sufficient showing to entitle him to a small reduction of the nondischargeable portion of debt and to a restructuring of the remaining debt. Accordingly, it is hereby

**ORDERED, ADJUDGED, AND DECREED** that the relief sought by the Debtor/Plaintiff, John Roe, is **GRANTED** with respect to the Bar exam loan debt owed to Defendant Pennsylvania Higher Education Assistance Agency, and **DENIED** with respect to his remaining student loan debts owed to Defendants Pennsylvania Higher Education Assistance Agency and United Student Aid Funds, Inc., which are hereby declared to be **NONDISCHARGEABLE** as follows: the United Student Aid Funds, Inc.

---

**57.** *Tennessee Student Assistance Corp. v. Hornsby* (*In re Hornsby*), 144 F.3d 433 (6th Cir.Tenn. 1998); *Howell v. The Educ. Resources Inst.* (*In re Howell*), Case No. 95–70202–CMS–7 (Bankr. N.D.Ala. Jan. 5, 1996); *Heckathorn v. United States* (*In re Heckathorn*), 199 B.R. 188 (Bankr. N.D.Okla.1996); *Berthiaume v. Pennsylvania* *Higher Educ. Assistance Auth.* (*In re Berthiaume*), 138 B.R. 516 (Bankr.W.D.Ky.1992); *Bakkum v. Great Lakes Higher Educ. Corp.* (*In re Bakkum*), 139 B.R. 680 (Bankr.N.D.Ohio 1992); *The Cadle Co. v. Webb* (*In re Webb*), 132 B.R. 199 (Bankr.M.D.Fla.1991); *Love v. United States* (*In re Love*), 33 B.R. 753 (1983).

debt in the amount of $26,000.00 and the Pennsylvania Higher Education Assistance Agency debt in the amount of $10,100.00. In accordance with this Court's holding, the Debtor is to commence making regular monthly payments of $85.00 to Pennsylvania Higher Education Assistance Agency on January 1, 1999 until this loan is paid in full.[58] In addition, the Debtor is to commence making regular monthly payments of $200.00 to United Student Aid Funds, Inc. on January 1, 1999 until this loan is paid in full.[59] An appropriate order and judgment consistent with this memorandum order and opinion shall be filed immediately.

---

**58.** The Court assumed a fifteen-year repayment period in amortizing the modified principal balance and interest.

**59.** The Court assumed a twenty-year repayment period in amortizing the modified principal and interest.