In re James Ira MOORMAN and Linda Carroll Moorman, Debtors.

Linda MOORMAN, Plaintiff,

v.

COMMONWEALTH OF KENTUCKY, HIGHER EDUCATION ASSISTANCE AUTHORITY, Defendant.

Bankruptcy No. 48300413.
Adv. No. 4840014.

United States Bankruptcy Court,
W.D. Kentucky.

Nov. 7, 1984.

---

---

' Richard F. Casey, Frankfort, Ky., for defendant.

Russ Wilkey, Owensboro, Ky., for plaintiff.

Rhonda Taylor, Owensboro, Ky., Trustee.

## MEMORANDUM OPINION

MERRITT S. DEITZ, Jr., Bankruptcy Judge.

Stress—that modern malaise blamed for all manner of social evil and so pervasive as to have become almost fashionable—is claimed by its victim in this case to create an "undue hardship" justifying the forgiveness of a student loan.

This action was initiated by the debtor, Linda Moorman, against the Commonwealth of Kentucky Higher Education Assistance Authority, to obtain a bankruptcy discharge under 11 U.S.C. § 523(a)(8) of a student loan debt of $3,762.

The debtor, a 33-year-old unemployed mother of three, has a twelve-year employment history. She has completed three semesters of college, and last worked in a middle-management position for Citizens Bank of Owensboro. Her bank job was terminated in December, 1983, according to her, because of her bankruptcy, filed the previous month.

Mrs. Moorman's husband, also bankrupt, is a fireman and construction worker. They live on his earned income and her unemployment compensation of $272 biweekly. Their monthly income of $1,268 exceeds their budgeted monthly expenses, but only by a modest $31. The household budget first submitted by the debtors in the discovery stage of this litigation revealed certain questionable discretionary items, such as $679 a month for the maintenance and operation of three family vehicles, $65 monthly church contributions, and $52 monthly for savings or entertainment. Their first budget was later amended to reflect generally more pessimistic prospects for the family.

Neither Mrs. Moorman nor any members of her family suffer from any chronic illnesses requiring hospitalization. She has a nonthreatening heart condition known as mitral valve prolapse which, according to her internist, Dr. Sam Dulaney, causes no physical disability and requires no medication. Her overriding complaint is of general anxiety and stress, aggravated by the pressures of work and childrearing, causing symptoms of physical discomfort, among them shortness of breath, chest pain, hyperventilation, nervousness and general weakness. She cries a lot, and did so in the courtroom.

Dr. Dulaney's prognosis of the anxiety syndrome was, perhaps necessarily, elusive. He testified that among those "stressful situations" likely to produce discomfort were supervising other people, making daily decisions, meeting deadlines, and encountering conflicts with other human beings. The doctor was unable definitively to describe the unpleasant symptoms as recurrent, or to speculate as to when, or under what conditions, or if at all, they were likely to reappear.

Dr. Dulaney saw Mrs. Moorman only once, shortly before she was terminated at the bank, at about the time of her bankruptcy.

There are two elements of proof which cast an unfavorable light on the debtor's case. First, she applied for and receives unemployment compensation, a benefit which under state law requires a representation by the applicant that he or she is willing and able to work. In bankruptcy court, of course, Mrs. Moorman makes the directly contrary assertion. We may only assume, short of outright mendacity, that it still is an open question in her mind as to whether she can or cannot work.

Second, Mrs. Moorman testified that she has not sought suspension or deferment of payments toward the student loan, a contract option open to her which would have afforded at least interim relief while reaffirming her intention ultimately to honor the obligation. For all the court knows that option is still available to her. Until it is explored it would be premature for this court to assume her intention to pay.

A balanced review of this case precludes a finding of undue hardship. The list of "stressful situations" constructed by Dr. Dulaney could almost be an agenda for life itself, at least in the spheres of family and employment. Yet there is nothing in the record to suggest that Mrs. Moorman is at a physical or emotional disability to deal with them.

Neither was Dr. Dulaney able to testify that *any* future employment would carry with it the potential for unmanageable stress. On that point we would venture the broad proposition that stress *is* endemic to work, shaded only by degrees of job difficulty, emotional stability, the relationship of master to servant and skills to demands, and a host of other subtle factors. But we cannot proceed from an assumption that job-related stress in one context renders a person permanently and totally disabled from all forms of potential future employment. Mrs. Moorman herself, we have noted, has made contradictory statements about her ability to work, each of which served her own economic interests at the time.

The record compels the view that the debtor's stress and anxiety in late 1983 were directly related to the trauma of the pending bankruptcy. It is a tragedy repeated too frequently in this court that financial collapse carries with it adverse consequences for health, family life and employment. The bankruptcy discharge in fact is intended to be a palliative for what without it would become a wretched existence. The discharge has been extended to this debtor, with respect to all debts save the one here under inquiry.

Counsel for the lender in this case urges upon us a series of judicially-created undue hardship "tests", under any one of which, according to his advocacy, the court would be required to deny a discharge of the student loan.[1] The rigidity of some of those "tests" almost suggests that the solution to human suffering lies in the application of algebraic equations. Were we to choose among them, which we do not, we most likely would align closely with the "certainty of hopelessness" standard of *In re Briscoe*.[2]

While we admire the serious scholarship apparent in counsel's presentation, we cannot commit the court to a policy of mechanical evaluation of comprehensive human problems. "Undue hardship" is a concept so fraught with subjective elements that we must consider the totality of a debtor's circumstances to confirm its presence or absence. We used such a holistic analysis in the *Conard* and *Fischer* cases.[3] Our approach is not intended to yield a general rule applicable to a broad class of cases, but remains as flexible and adaptable as the concept of equity itself. We are able to say only that the whole of a debtor's condition, in an undue hardship case, should be sufficient to strike a chord of pity in the

1. Counsel cites in his exhaustive recitation of authorities the "mechanical" test and the "policy" test described in *In re Johnson,* 5 B.C.D. 532 (W.D.Pa.1979), and the "good faith" test of *In re Rice,* 13 B.R. 614 (D.C.S.D.1981).

2. 16 B.R. 128 (S.D.N.Y.1981).

3. *In re Conard,* 6 B.R. 151 (W.D.Ky.1980); *In re Fischer,* 23 B.R. 432 (W.D.Ky.1982).

heart of equity. The notes of this case do not ring quite so true.