In re William Stephen WHITE, Debtor.

William Stephen White, Plaintiff,

v.

United States Department of Education, Sallie Mae, Nebraska Student Loan Program, Citibank Student Loan Corporation, Defendants.

Bankruptcy No. 98–03248–BGC–7. Adversary No. 98–00320.

United States Bankruptcy Court, N.D. Alabama, Southern Division.

Dec. 1, 1999.

Kimberly Glass, Birmingham, Alabama, for the debtor.

Leon Kelly, Birmingham, Alabama, Assistant United States Attorney, for United States.

Mark Williams, Birmingham, Alabama, for Nebraska Student Loan Corporation.

### MEMORANDUM OPINION ON MOTIONS FOR SUMMARY JUDGMENT ON COMPLAINT TO DETERMINE DISCHARGEABILITY OF STUDENT LOAN DEBT

BENJAMIN COHEN, Bankruptcy Judge.

The matters before the Court are motions for summary judgment filed by the

United States Department of Education ("USDE") and the Nebraska Student Loan Program ("NSLP"), the remaining defendants.[1] After notice, a hearing was held on March 10, 1999. Ms. Kimberly B. Glass, the debtors' attorney; Mr. Leon Kelly, the government's attorney; and Mr. Mark Williams, the attorney for NSLP, appeared.

The matters were submitted on the parties' *Joint Stipulation of Facts* and on Mr. White's deposition, submitted by the defendants along with documents identified as exhibits to that deposition.

### I. Contentions

Mr. White contends that student loan debts owed to USDE and NSLP should be discharged in his Chapter 7 bankruptcy

1. A default judgment was entered on April 28, 1999 in favor of the debtor and against the third defendant Citibank Student Loan Corporation. The debtor's complaint also listed Sallie Mae as a defendant for certain loans, but the debtor alleged that, "The Nebraska Student Loan Program is presently servicing those loans." Therefore, this Court has assumed that the debt owed to NSLP is the same as that alleged to be owed to Sallie Mae and has not considered Sallie Mae as an actual defendant.

2. The current undue hardship subsection of section 523 is "(a)(8)" only. The prior subsection included the designation (a)(8)**(B).** The substance is the same. Only the numbers have changed. See also note 5 below.

3. In paragraph 2 of the parties' joint stipulation, the debtor agreed that the separate "HEAL" debt owed to USDE in the amount $6,577.94, plus interest accruing after September 24, 1998, is, by virtue of 42 U.S.C. § 292, not dischargeable in this bankruptcy case. Consequently, only the non-HEAL loans owed to USDE and NSLP are addressed in this opinion.

4. Writing for the court, Circuit Judge R. Lanier Anderson, III, explained:
 A. Introduction
 Under Fed.R.Civ.P. 56(c), a moving party is entitled to summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The substantive

pursuant to former section 523(a)(8)(B) of the Bankruptcy Code because excepting them from his discharge will impose an undue hardship on him. 11 U.S.C. 523(a)(8)(B).[2] USDE and NSLP disagree and have moved for summary judgment on all issues. This Court's review must begin there.[3]

### II. Summary Judgment Standard

The standards in this Circuit for addressing a summary judgment motion are outlined in the decisions of the Eleventh Circuit Court of Appeals decision in *Fitzpatrick v. City of Atlanta,* 2 F.3d 1112 (11th Cir.1993). This Court has applied those standards in deciding the pending matters.[4]

law applicable to the case determines which facts are material. The district court should resolve all reasonable doubts about the facts in favor of the non-movant, and draw all justifiable inferences in his or her favor.

In *Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), the Supreme Court instructed the federal courts to employ a two-part framework of shifting burdens to determine whether, as regards a given material fact, there exists a genuine issue precluding summary judgment. The operation of this framework was modified significantly in *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The current framework is set out below.

B. Movant's Initial Burden
The movant's initial burden consists of a responsibility to inform the court of the basis for its motion and to identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. The nature of this responsibility varies, however, depending on whether the legal issues, as to which the facts in question pertain, are ones on which the movant or the non-movant would bear the burden of proof at trial.

1. For Issues on Which Movant Would Bear Burden of Proof at Trial
As interpreted by this court sitting en banc, *Celotex* requires that for issues on which the movant would bear the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of

### III. Findings of Fact

The Court adopts the parties' written stipulation of facts as its findings of fact. No other findings are needed as the parties have agreed, in writing, that:

1. Mr. White is indebted to the Nebraska Student Loan Program (NSLP) on three notes executed by him on July 16, 1992, July 16, 1992, and September 20, 1993, in the respective amounts of $7,500.00 (Loan 1), $4,000.00 (Loan 2), and $1,260.00 (Loan 3). Pursuant to the Loans, Debtor received initial disbursements totaling $12,760.00. As of October 7, 1998, Debtor owed NSLP $14,896.06, plus accruing interest.

2. Mr. White is indebted to the United States Department of Health and Human Services (USHHS) for a HEAL loan in the amount of $6,577.94 as of September 24, 1998, plus accruing interest. The HEAL loan is nondischargeable pursuant to 42 U.S.C. § 292.

3. Mr. White is indebted to the United States Department of Education (USDE) for loans from the William D.

---

material fact: it must support its motion with credible evidence that would entitle it to a directed verdict if not controverted at trial. In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party. If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the non-moving party, in response, comes forward with significant, probative evidence demonstrating the existence of a triable issue of fact.

2. For Issues on Which Non–Movant Would Bear Burden of Proof at Trial

For issues, however, on which the non-movant would bear the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar material negating the opponent's claim in order to discharge this initial responsibility. Instead, the moving party simply may show, that is, point out to the district court—that there is an absence of evidence to support the non-moving party's case. Alternatively, the moving party may support its motion for summary judgment with affirmative evidence demonstrating that the non-moving party will be unable to prove its case at trial.

C. Non–Movant's Responsibility Once Movant Satisfies Initial Burden

If the party moving for summary judgment fails to discharge the initial burden, then the motion must be denied and the court need not consider what, if any, showing the non-movant has made. If, however, the movant carries the initial summary judgment burden in one of the ways discussed above, responsibility then devolves upon the non-movant to show the existence of a genuine issue as to the material fact.

1. For Issues on Which Movant Would Bear Burden of Proof at Trial

For issues on which the movant would bear the burden of proof at trial, the non-movant, in order to avoid summary judgment, must come forward with evidence sufficient to call into question the inference created by the movant's evidence on the particular material fact. Only if after introduction of the non-movant's evidence, the combined body of evidence presented by the two parties relevant to the material fact is still such that the movant would be entitled to a directed verdict at trial—that is, such that no reasonable jury could find for the non-movant—should the movant be permitted to prevail without a full trial on the issues.

2. For Issues on Which Non–Movant Would Bear Burden of Proof at Trial

For issues on which the non-movant would bear the burden of proof at trial, the means of rebuttal available to the non-movant vary depending on whether the movant put on evidence affirmatively negating the material fact or instead demonstrated an absence of evidence on the issue. Where the movant did the former, then the non-movant must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated. Where the movant did the latter, the non-movant must respond in one of two ways. First, he or she may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was overlooked or ignored by the moving party, who has thus failed to meet the initial burden of showing an absence of evidence. Second, he or she may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.

2 F.3d at 1115–1117 (for the sake of clarity and brevity, internal quotation marks, citations, footnotes, indentations, brackets, and ellipses have been omitted).

Ford Federal Direct Loan Program in the amount of $34,479.26 as of October 18, 1998, plus accruing interest.

4. The loans from NSLP described in paragraph 1 and the loans from the USDE described in paragraph 3 are "educational loans" within the meaning of 11 U.S.C. § 523(a)(8).

5. None of the educational loans due to NSLP or the USDE first became due more than 7 years before the date of the filing of the petition.

6. Mr. White graduated from Oral Roberts University with a bachelor's degree in biology.

7. Upon graduating from college, Mr. White applied and was accepted to medical school at the University of Alabama in Birmingham School of Medicine. Mr. White's goal was to become a medical doctor.

8. Mr. White entered medical school in the fall quarter of 1992.

9. While in medical school, Mr. White was reimbursed for some tuition and living expenses by the U.S. Navy under the Armed Forces Health Professions Scholarship Program. In order to cover the expenses and tuition that were not reimbursed by the Navy, Mr. White took the above described educational loans.

10. In the spring of 1994, Mr. White was diagnosed as suffering from narcolepsy.

11. Due to the difficulties caused by his condition, Mr. White's grades suffered and he was dismissed from school more than once but each time was reinstated and required to repeat certain course work.

12. After attending medical school for seven non-consecutive quarters, Mr. White was dismissed from medical school following the spring quarter of 1996 was this time denied reinstatement.

13. At that time, while looking for employment, Mr. White began working from his home doing computer graphic design. Mr. White does not have a degree in computer graphic design but has taught himself the techniques.

14. For one year Mr. White attempted to make a living working from his home while looking for employment. He made a total of $3,400.00 from his home-based business.

15. In July 1997, Mr. White accepted a job as a graphic designer with Tradeshow and Marketing where he is presently employed at an annual salary of $20,000.00. His monthly net income at the time of filing was $1334.60.

16. After various deferments and forbearance agreements ranging from 46 to 64 months, Mr. White's loans from NSLP were in "repayment" for five months at the time the bankruptcy petition was filed. Mr. White made four payments.

17. The first payment on Mr. White's loan from USDE was due on March 14, 1997. A forbearance was then granted until March 14, 1998. Payments were then established at $402.20 per month. Mr. White made one payment after this date of $200.00.

18. The USDE William D. Ford Loan Program offers a variety of flexible payment plans which would allow payment tailored to Mr. White's income and circumstances.

19. In late March or early April of 1998, Mr. White's vehicle, a 1991 Mitsubishi Eclipse ceased operating. Mr. White had already paid several hundred dollars for repairs to the vehicle over the past several months. Mr. White was unable to purchase a vehicle so he leased a 1998 Nissan Pathfinder at $274.11 per month. The lease is joint with his wife. Ms. White drives a 1992 BMW 325 upon which the monthly payments are $264.42.

20. Mr. White filed for relief under Chapter 7 of the Bankruptcy Code on May 15, 1998.

21. At the time of the filing of the petition, Mr. White and his wife rented an apartment for $695.00 per month. Mr. White's share of the rent was $347.50 per month. After Mr. White filed his petition for relief, Mr. White's wife purchased a house for $148,000.00. Ms. White used her own money as a down payment on the house and the deed to the house is in only her name. The mortgage payment is $1044.64 per month. By agreement with his wife, Mr. White's share of the monthly mortgage payment is the same as he was contributing toward the rent, i.e. $347.50.

22. Mr. White's wife is a self-employed optometrist. Her monthly income varies depending on the number of clients serviced during the month. She has been licensed as an optometrist for less than two years. She estimates her gross monthly income will average approximately $8,500.00. From this amount, she spends approximately $500.00 per month in overhead and pays approximately $3,200.00 in taxes. Ms. White nets approximately $4,800.00 per month.

23. Mr. and Ms. White would testify that their monthly living expenses as a total and as allocated between each of them are as follows:

| EXPENSE ITEMS | PLAINTIFF'S EXPENSES | SPOUSE'S EXPENSES | TOTAL HOUSEHOLD |
|---|---|---|---|
| mortgage | $374.50 | $697.14 | $1,044.64 |
| auto loan | $274.00 | $264.42 | $538.42 |
| auto insurance | $47.24 | $75.62 | $122.86 |
| utilities | $67.50 | $67.50 | $135.00 |
| health insurance | $0.00 | $159.00 | $159.00 |
| disability insurance | $0.00 | $101.30 | $101.30 |
| food | $200.00 | $125.00 | $325.00 |
| gas | $156.00 | $156.00 | $312.00 |
| medication | $150.00 | $20.00 | $170.00 |
| medical expenses | $35.00 | $10.00 | $45.00 |
| telephone | $30.00 | $60.00 | $90.00 |
| student loans | ? | $950.52 | $950.52 |
| tithe | $133.50 | $450.00 | $583.50 |
| toiletries | $30.00 | $50.00 | $80.00 |
| clothing | $30.00 | $50.00 | $80.00 |
| **TOTAL** | **$1,500.74** | **$3,236.50** | **$4,737.24** |

The Defendants do not stipulate that the above-allocation of expenses is either accurate or appropriate.

24. Mr. White still suffers from narcolepsy and is under a doctor's care for that condition. He takes two different medications that help with his condition but do not cure it. There is no cure for narcolepsy. The condition results in a diminished state of arousal and requires the person to take frequent breaks or naps in order to function. With medication, the need for naps or breaks is lessened but not eliminated. Mr. White will always have to work where he can control his hours and work at his own pace. These requirements would make it impossible for Mr. White to maintain some jobs. His current job allows him to work at his own pace, even allowing him to take naps at the office when needed. He has been able to work a regular workweek and has received good performance reviews at his current job.

25. Mr. White's salary at his present job is at its maximum level except for periodical "cost of living" raises and small bonuses. Mr. White recently received a raise in pay that increased his yearly gross income to $22,000.00. This resulted in an increase in his take-home pay of approximately $70.00 per month, from $1334.00 to $1404.00.

26. Mr. White would testify as follows: "Other than similar, irregular increases, Mr. White does not expect to receive any substantial increase in pay from his current employment. Mr. White's salary is average or above average for similar positions in the industry. Mr. White does not have the necessary educational background to obtain a higher level position. Mr. White has also looked for employment opportunities related to his biology degree and has been unable to locate one for which he would be qualified that would even match his present salary. In order to achieve a better paying job, Mr. White would need to obtain either a degree in computer graphic design or to obtain his teaching certificate. Mr. White does not anticipate being able to do either of these things anytime in the near future." The Defendants do not stipulate to the accuracy of this testimony.

27. Ms. White estimates that her current gross annual income is approximately $102,000.00. Ms. White is unable to estimate how her income will differ in the future. Her income is somewhat dependent upon the economy. Her income could either increase or decrease in the future.

28. Ms. White is not indebted on any of the loans to either NSLP or USDE. All of the loans from NSLP were taken out before she and Mr. White married in August 1995. Some of the loans making up the USDE indebtedness were taken out prior to Mr. White's marriage. Some may have been taken out after August 1995.

*Joint Stipulation of Facts*, filed March 8, 1999 (Proceeding No. 27).

## IV. Burdens of Proof

### A. Standard Burdens of Proof in Student Loan Dischargeability Proceedings

 A creditor seeking to have a student loan debt declared nondischargeable has the initial burden of proof at trial under all section 523(a)(8) proceedings. To satisfy that burden the creditor must prove: (1) the existence of a debt; (2) for an educational loan; (3) made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution; (4) that first became due less than seven years prior to the date of the bankruptcy.[5] If the creditor meets that initial burden, the burden shifts to the debtor to prove, if the debtor so alleges, the undue hardship exception allowed by section 523(a)(8)(B).

---

**5.** This seven-year provision has been removed from the Bankruptcy Code. The court in *Andersen v. UNIPAC–NEBHELP (In re Andersen)*, 179 F.3d 1253, 1255 n. 3 (10th Cir.1999) explains:

Prior to October 1998, § 523(a)(8) provided that educational loans were not dischargeable unless, (A) the loan first became due more than seven years before the date of the filing of the petition (the "seven-year rule"), or (B) excepting the debt from discharge would impose an undue hardship. However, The Higher Education Amendments of 1998, Pub.L. No. 105 § 244, § 971, 112 Stat. 1581, 1837 (1998), eliminated § 523(a)(8)'s "seven-year rule" in all

cases filed after October 7, 1998, leaving only the undue hardship exception to nondischargeability. While this amendment does not affect the present case, it does tend to support the argument that Congress has sought to progressively restrict the cases in which educational debts will be discharged. *Id.* However, Mr. White's Chapter 7 bankruptcy case was filed prior to the effective date of the amendments to section 523(a)(8) contained in the Act. Section 971(b) of that act made the amendments to 523(a)(8) effective only with respect to bankruptcy cases commenced after the date of enactment. Consequently the seven-year provision still applies here.

## B. Additional Burdens of Proof Where Motions for Summary Judgment Are Filed in Student Loan Dischargeability Proceedings

■ Where the same creditor seeks summary judgment, the burdens of proof are partially different. Under *Fitzpatrick* and pursuant to section 523(a)(8), the first burden for the creditor, (like the general burden under section 523(a)(8)) is to prove, by credible evidence that would support a directed verdict on the issue at trial, the existence of a debt that falls within the parameters of section 523(a)(8), that is, a debt for an educational loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, that first became due less than seven years prior to the date of the bankruptcy.

■ If the creditor satisfies that burden, and the debtor has claimed relief under the undue hardship provision of section 523(a)(8), the creditor must satisfy a second, and quite different, burden of proof. That is, the creditor must prove that there is an absence of evidence to support the defendant's claim of undue hardship or *alternatively* the creditor must present affirmative evidence demonstrating that the debtor will be unable to prove undue hardship claim at trial.

## C. General Standards of Proof for Summary Judgment Motions

Of course, in addition to the burdens discussed above, there is the general standard (whether in the bankruptcy context or not) that all who seek summary judgment must meet, that is, do "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judg-

ment as a matter of law." *Fitzpatrick* at 1115.[6]

## V. Issues and Conclusions of Law

This Court has considered the interaction of the above three standards in addressing the pending matters.

### A. Have USDE and NSLP Proved the Existence of Debts?

Yes. The parties' stipulation of facts proves the existence of debts that fall within the parameters of section 523(a)(8). These debts are educational loans made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, that first became due less than seven years prior to the date of the bankruptcy. Consequently, as a matter of law, the Court finds that the moving parties have satisfied their initial burdens of proof, as to both dischargeability and summary judgment.

### B. Have USDE and NSLP Shown the Lack of Any Genuine Issues of Material Fact as to Matters on Which They Carry the Burden of Proof?

Yes. The debtor stipulated to the existence of a debt to USDE in the amount of $34,479.26, plus interest accruing after October 18, 1998, and to the existence of debts to NSLP totaling $14,896.06, plus interest accruing after October 7, 1998, which, *absent "undue hardship,"* are nondischargeable under section 523(a)(8). Consequently, no issues of material fact exist, regarding the existence of debts owed to USDE and NSLP which qualify for non-dischargeability under section 523(a)(8) and the amount of those debts. Consequently, as a matter of law, the Court finds that the moving parties have met the general standards of proof required of all summary judgment movants.

6. In that regard, "The substantive law applicable to the case determines which facts are material." *Id.*

**C. Have USDE and NSLP Shown Either an Absence of Evidence of Undue Hardship or Presented Affirmative Evidence that the Debtor Will Be Unable to Prove Undue Hardship?**

Yes. As explained below, the defendants have satisfied the second burden of proof criteria required when a summary judgment motion is filed in a student loan dischargeability proceeding.

### 1. Legal Framework

■ This Court has adopted the test described by the Court of Appeals for the Second Circuit in *Brunner v. New York State Higher Edu. Serv. Corp.*, 831 F.2d 395, 396 (2nd Cir.1987) to determine whether repayment of a student loan will impose an undue hardship on a debtor. Under *Brunner*, a debtor must demonstrate: (1) that he cannot maintain, based on current income and expenses, a "minimal" standard of living for himself and his dependents if forced to repay the loan; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loan; and, (3) that the debtor has made a good faith effort to repay the loan. See this Court's opinions in *O'Flaherty v. Nellie Mae, Inc. (In re O'Flaherty)*, 204 B.R. 793, 796 (Bankr.N.D.Ala.1997) and *Halverson v. Pennsylvania Higher Education Assistance Agency (In re Halverson)*, 189 B.R. 840, 844 (Bankr.N.D.Ala.1995). Presumably, where a creditor seeks summary judgment, the same factors apply.

### 2. "Application" of *Brunner*

At the hearing on this proceeding, the obvious point of disagreement between the debtor and the defendants was whether the Court should consider the debtor's wife's income when deciding the issue of undue hardship. The debtor insisted that the correlation between Ms. White's income and Mr. White's actual lifestyle, (which is mostly dependant on his wife's ample income), must be ignored, and the question of undue hardship must be answered based on the theoretical lifestyle that Mr. White might be forced to lead if he was not married or if his present wife did not share her income with him. The defendants insisted that Ms. White's income should be considered.

■ Under *Brunner*, the key question is whether or not Mr. White can pay his student loans and maintain a minimal lifestyle. To make that determination, the Court has analyzed the issue with and without considering Ms. White's income. Legally however, the Court finds that Ms. White's income should be included.

### a. Mr. White's Ability to Maintain a Minimal Lifestyle on His Income Alone

The Court is aware that the debtor's monthly payment on the USDE loan is $402.00; however, the Court has not been provided the amount of the monthly payment on the NSLP loan. And, neither USDE nor NSLP has told the Court what repayment period is applicable to either's particular loan. Nevertheless, useable information necessary to make "undue hardship" calculations can be extrapolated from statutorily prescribed minimum requirements applicable to student loans.

According to the documents supplied to the Court, each of the loans involved in this case are direct Stafford loans. The least generous repayment period available to borrowers of such direct student loans made after July 1, 1994 (here the USDE loan) is 10 years. 34 C.F.R. § 685.208(b). And the borrower may not be required to pay more than 8.25 percent interest per annum on the amounts borrowed. 20 U.S.C. § 1087e(b)(1). The monthly payment amount which the USDE asserts is owed by the debtor is commensurate with a 10 year repayment schedule at an interest rate which is less than 8.25 percent.

For the two direct student loans made to Mr. White by NSLP after July 1, 1988, but before October 1, 1992, the applicable

rate of interest is 8 percent for the first 4 years of the repayment period and 10 percent during the remainder of the repayment period. 20 U.S.C. § 1077a(d). For the direct student loan made by NSLP to Mr. White after October 1, 1992, but before July 1, 1994, the applicable rate of interest may not exceed 9 percent. 20 U.S.C. § 1077a(e). The applicable repayment periods for the respective NSLP loans cannot, by law, be less than 5 years nor more than 10 years. 20 U.S.C. § 1078(b)(9)(A). Assuming the maximum interest rate applicable to any of the NSLP loans, 10 percent, the maximum monthly payment that could be required from Mr. White to NSLP, assuming the minimum 5 year repayment period, would be $271.11. Adding that amount to the $402.00 which Mr. White is obligated pay to USDE each month would bring the total of Mr. White's monthly student loan payments to $673.11.

Mr. White's net wages after deduction for taxes are $1,404.00 monthly.[7] Deducting $673.11 from that amount would leave Mr. White with a monthly surplus of $730.89 to pay living expenses.

■ According to the United States Department of Health and Human Services Poverty Guidelines, the poverty threshold is met by a family of one with pre-tax annual income of $8,240 or less. Annual Update of the HHS Poverty Guidelines, 64 Fed.Reg. 13428 (1999). If this Court adopted these guidelines as a bright line test of "minimal standard of living," as have some courts, Mr. White's annual pre-tax income of $20,000.00 would be almost two and a half times the poverty threshold for a single person and greater than the poverty threshold for a family of five ($19,520).[8]

From a different standpoint, deducting the debtor's projected monthly student loan obligations from his net pay, would leave Mr. White with an annual surplus of $8,770.68 on which to live. Whether he could provide life's necessities for himself on that amount is a matter of proof, for which Mr. White would carry the burden at trial.

### b. Mr. White's Ability to Maintain a Minimal Lifestyle on the Couple's Combined Income

■ Section 523(a)(8)(B) requires consideration of a debtor's actual circumstances, not the theoretical. In actuality, Mr. White's necessities are supplied for the most part by his wife who could easily support them both, without any contribution from Mr. White. With this support, Mr. White's lifestyle is quite comfortable and far from "minimal." The only question then is: Should the Court consider Ms. White's income? The answer is yes, according to the overwhelming weight of legal authority.

---

7. Mr. White, it seems, does not contend that his narcolepsy makes him unemployable or that it prevents him from being employed at his present level of employment. He argues simply that the narcolepsy limits his earning potential by preventing him from obtaining more profitable employment. Since there is presently no evidence before the Court that contradicts Mr. White's contention, this Court will conduct the analysis under *Brunner* based solely on Mr. White's present income and assume for the sake of that analysis that Mr. White's income will not increase appreciably over the applicable repayment periods of his student loans.

8. Poverty, of course, is not a prerequisite to section 523(a)(8)(B) dischargeability and it might well be argued that the poverty threshold represents a less than "minimal" standard of living. On the other hand, the argument could be made that the poverty threshold provides an objective starting point for determining a "minimal" standard of living.

For convenience some courts recognize the United States Department of Health and Human Services Poverty Guidelines as the level of a "minimum standard of living" and recognize an annual income above or below that as exceeding or falling below the "minimum standard of living." This Court disagrees as it cannot accept that a standard of living in poverty is an acceptable standard of living, below which there are levels of less comfort.

"[C]ourts have routinely considered the income of a debtor's spouse when determining whether the debtor's household income and expenses are in such a dire condition that a discharge of student loans is warranted." *Mitchell v. United States Department of Education (In re Mitchell)*, 210 B.R. 105, 108 (Bankr.N.D.Ohio 1996), *citing Ipsen v. Higher Educ. Assistance Foundation (In re Ipsen)*, 149 B.R. 583

(Bankr.W.D.Mo.1992), *citing In re Velis*, 123 B.R. 497, 512 (D.N.J.1991). In fact, the vast majority of the reported opinions in which the dischargeability of a student loan debt owed by a married debtor was at issue, the courts have considered the earnings of both the debtor and his or her spouse for the purpose of evaluating the quality of the debtor's lifestyle.[9]

**9.** *See United Student Aid Funds, Inc. v. Pena (In re Pena)*, 155 F.3d 1108, 1112–1113 (9th Cir.1998); *Rice v. United States (In re Rice)*, 78 F.3d 1144, 1150 (6th Cir.1996); *In re Rose*, 227 B.R. 518, 525 (W.D.Mo.1998), *aff'd in part and remanded in part*, 187 F.3d 926 (8th Cir.1999); *Virginia State Educ. Assistance Auth. v. Dillon*, 189 B.R. 382, 385 (W.D.Va. 1995); *United States v. Rice*, 182 B.R. 759, 760 (N.D.Ohio 1994), *aff'd*, 78 F.3d 1144 (6th Cir.1996); *United States v. Kephart*, 170 B.R. 787, 792 (W.D.N.Y.1994); *Roe v. The Law Unit (In re Roe)*, 226 B.R. 258, 263 (Bankr. N.D.Ala.1998); *Pinkham v. United States (In re Pinkham)*, 224 B.R. 728, 733 (Bankr. E.D.Mo.1998); *Lebovits v. Chase Manhattan Bank (In re Lebovits)*, 223 B.R. 265, 268 (Bankr.E.D.N.Y.1998); *Coats v. New Jersey Higher Educ. Assistance Auth. (In re Coats)*, 214 B.R. 397, 401 (Bankr.N.D.Okla.1997); *Student Loan Marketing Ass'n v. Zierden– Landmesser (In re Zierden–Landmesser)*, 214 B.R. 300, 304 (Bankr.M.D.Pa.1997); *Mitchell v. United States Dep't of Educ. (In re Mitchell)*, 210 B.R. 105, 108 (Bankr.N.D.Ohio 1996); *Steuber v. United States Dep't of Educ. (In re Steuber)*, 200 B.R. 31, 35–36 (Bankr.W.D.Mo. 1996); *Skaggs v. Great Lakes Higher Educ. Corp. (In re Skaggs)*, 196 B.R. 865, 867 (Bankr.W.D.Okla.1996); *Vazquez v. United Student Aid Funds, Inc. (In re Vazquez)*, 194 B.R. 677, 679 (Bankr.S.D.Fla.1996); *Dillon v. Virginia State Educ. Auth. (In re Dillon)*, 191 B.R. 658, 659 (Bankr.W.D.Va.1994), *rev'd on other grounds*, 189 B.R. 382 (W.D.Va.1995); *Halverson v. Pennsylvania Higher Educ. Assistance Agency (In re Halverson)*, 189 B.R. 840, 842 (Bankr.N.D.Ala.1995); *Fox v. Student Loan Marketing Ass'n (In re Fox)*, 189 B.R. 115, 119 (Bankr.N.D.Ohio 1995); *Goranson v. Pennsylvania Higher Educ. Assistance Agency (In re Goranson)*, 183 B.R. 52, 54 (Bankr. W.D.N.Y.1995); *Barrows v. Illinois Student Assistance Comm'n (In re Barrows)*, 182 B.R. 640, 646 (Bankr.D.N.H.1994); *Garrett v. New Hampshire Higher Educ. Assistance Found. (In re Garrett)*, 180 B.R. 358, 363 (Bankr. D.N.H.1995); *Wilson v. Missouri Higher Educ. Loan Auth. (In re Wilson)*, 177 B.R. 246, 249 (Bankr.E.D.Va.1994); *Rice v. United States Dep't of Health & Human Services (In re Rice)*, 171 B.R. 989, 993 (Bankr.N.D.Ohio 1993), *aff'd in part and rev'd in part on other grounds*, 182 B.R. 759 (N.D.Ohio 1994), *aff'd*, 78 F.3d 1144 (6th Cir.1996); *Cooper v. Nebraska Student Loan Program, Inc. (In re Cooper)*, 167 B.R. 966, 968 (Bankr.D.Kan.1994); *Sands v. United Student Aid Funds, Inc. (In re Sands)*, 166 B.R. 299, 307 (Bankr.W.D.Mich. 1994); *Sallie Mae v. Plotkin (In re Plotkin)*, 164 B.R. 623, 625 (Bankr.W.D.Ark.1994); *Matthews v. United States (In re Matthews)*, 150 B.R. 11, 14 (Bankr.W.D.Pa.1992); *Ipsen v. Higher Educ. Assistance Found. (In re Ipsen)*, 149 B.R. 583, 585 · (Bankr.W.D.Mo. 1992); *Koch v. Pennsylvania Higher Educ. Assistance Agency (In re Koch)*, 144 B.R. 959, 962 (Bankr.W.D.Pa.1992); *Saburah v. United States Dep't of Educ. (In re Saburah)*, 136 B.R. 246, 255 (Bankr.C.D.Cal.1992); *Emnett v. United States (In re Emnett)*, 127 B.R. 599, 602 (Bankr.E.D.Ky.1991); *Correll v. Union Nat'l Bank of Pittsburg (In re Correll)*, 105 B.R. 302, 308 (Bankr.W.D.Pa.1989); *Coleman v. Higher Educ. Assistance Found. (In re Coleman)*, 98 B.R. 443, 452 (Bankr.S.D.Ind.1989); *Childs v. Higher Educ. Assistance Found. (In re Childs)*, 89 B.R. 819, 820 (Bankr.D.Neb. 1988); *Carter v. Higher Educ. Assistance Found. (In re Carter)*, 77 B.R. 25, 27 (Bankr. W.D.Pa.1987); *Hines v. United States (In re Hines)*, 63 B.R. 731, 737 (Bankr.D.S.D.1986); *Marion v. Pennsylvania Higher Educ. Assistance Agency (In re Marion)*, 61 B.R. 815, 817 (Bankr.W.D.Pa.1986); *Moorman v. Higher Educ. Assistance Auth. (In re Moorman)*, 44 B.R. 135, 136 (Bankr.W.D.Ky.1984); *Richardson v. Ohio (In re Richardson)*, 32 B.R. 5, 7 (Bankr.S.D.Ohio 1983); *Albert v. Ohio Student Loan Comm'n (In re Albert)*, 25 B.R. 98, 101 (Bankr.N.D.Ohio 1982); *Hartung v. University of Akron (In re Hartung)*, 24 B.R. 850, 852 (Bankr.N.D.Ohio 1982); *Ford v. New York State Higher Educ. Services Corp. (In re Ford)*, 22 B.R. 442, 446 (Bankr.W.D.N.Y. 1982); *Lezer v. New York State Higher Educ. Services Corp. (In re Lezer)*, 21 B.R. 783, 789 (Bankr.N.D.N.Y.1982); *United States v. Brown (In re Brown)*, 18 B.R. 219, 222 (Bankr.D.Kan.1982); *Johnson v. Graceland*

■ This Court agrees, and finds as a matter of law that Ms. White's income should be considered in deciding whether Mr. White is able to pay his student loans and maintain a minimal lifestyle.

The debtor disagrees and argues that the Court should not consider Ms. White's income because the Court should consider only the potential lifestyle that could exist for a debtor if the debtor's spouse chooses not to support the debtor or if the couple separates or divorces, not the couples' current, actual lifestyle. The Court must disagree.

■ Couples not only provide financial support to one another, but each partner has a legal obligation, enforceable between them, to support one another to the extent of individual capabilities. Family law concepts of alimony and separate maintenance are based on those obligations.[10] And where there is a claimed inability of one spouse to provide the necessaries of life, public assistance and welfare laws presume spousal support and specifically condition the receipt of such benefits on the recipient.[11]

In the bankruptcy context, section 523, by its terms, plainly considers the impact of the exception of a student loan debt from discharge on both the debtor *and his or her dependents*. A family member can be a dependent of, or a provider for, the debtor. Either way, the family member's very existence impacts the quality of the debtor's lifestyle, maybe adversely, maybe favorably. For example, if Mr. White's situation were reversed and Ms. White were the debtor in this case seeking to discharge student loans, would not Ms. White, in furtherance of that effort, be quick to claim Mr. White's dependence?

In resolving similar issues under the Bankruptcy Code, courts have recognized the rights of spouses to mutual financial support. For example, for purposes of determining whether or not, under section

*College (In re Johnson)*, 17 B.R. 95, 99 (Bankr. W.D.Mo.1981); *Connecticut Student Loan Found., Inc. v. Bagley (In re Bagley)*, 4 B.R. 248, 249 (Bankr.D.Ariz.1980); *Pennsylvania Higher Educ. Assistance Agency v. James (In re James)*, 4 B.R. 115, 119 (Bankr.W.D.Pa.1980); *Vermont Student Assistance Corp. v. Ewell (In re Ewell)*, 1 B.R. 311, 313 (Bankr.D.Vt.1979); *In re Garcia*, 1 B.R. 253, 254 (Bankr.S.D.Fla. 1979).

10. Code of Ala.1975, § 30–2–51(a) provides that "[i]f either spouse has no separate estate or if it is insufficient for the maintenance of a spouse, the judge, upon granting a divorce, at his or her discretion, may order to a spouse an allowance out of the estate of the other spouse, taking into consideration the value thereof and the condition of the spouse's family." "The purpose of alimony is to preserve, insofar as possible, the economic status quo of the parties as it existed during the marriage." *Madden v. Madden*, 399 So.2d 304, 305 (Ala.Civ.App.1981). Although originally based on the common law duty of a husband to support his wife, the Alabama alimony statute, subsequent to the decision of the Supreme Court of the United States in *Orr v. Orr*, 440 U.S. 268, 99 S.Ct. 1102, 59 L.Ed.2d 306 (1979), now permits an award of alimony to either spouse. *Orr v. Orr*, 374 So.2d 895, 897 (Ala.Civ.App.1979), *cert. denied*, 374 So.2d 898 (Ala.1979). *See Elliott v. Elliott*,

410 So.2d 74 (Ala.Civ.App.1982) (upholding trial court's award of alimony to husband).

And even absent a divorce, in the event of separation or abandonment, one spouse may seek separate maintenance, in equity, from the other. *Ex parte Hale*, 246 Ala. 40, 45, 18 So.2d 713, 718 (1944). *See McWilliams v. McWilliams*, 370 Pa.Super. 595, 537 A.2d 35 (1988) (reversing trial court's refusal to award separate maintenance to needy husband); *Nolan v. Nolan*, 117 Misc.2d 24, 457 N.Y.S.2d 172 (N.Y.Fam.Ct.1982) (directing wife to pay $100 in support to unemployed, destitute husband).

11. See, for example, Code of Ala.1975, § 38–4–4, entitled "Reduction, cancellation or continuance of assistance grant when recipient becomes possessed of income or resources," provides that "[i]f at any time the recipient of public assistance, *or the husband or wife of such recipient*, shall become possessed of any income or resources in excess of that owned or being received at the date of the application, it shall be the duty of the recipient immediately to notify the county department of the facts in the case. The county department, upon the notification or upon otherwise learning the facts, shall, after investigation, continue, reduce or cancel the amount of the grant as the facts may warrant." (Emphasis added).

523(a)(15)(A), the benefit to a debtor of discharging a non-support obligation arising from a divorce outweighs the detriment such discharge would have on the debtor's former spouse, courts have considered both the income and expenses of the debtor's new spouse and the income and expenses of the debtor's former spouse's new spouse.[12] And courts have taken into consideration the income and expenses of the debtor's spouse in determining whether or not a debtor is devoting all of his or her disposable income to the fulfillment of a Chapter 13 plan, as is required for confirmation under section 1325(b)(1)(B).[13]

But the debtor counters by arguing that even if Ms. White's income is considered, that income should be considered only to the extent of Ms. White's agreed share of the Whites' combined living expenses. If not, the debtor argues further, Ms. White will, in effect, be forced to help shoulder Mr. White's student loan debt by being required to pay more than her fair share of living expenses, while that portion of Mr. White's income which ordinarily would be devoted to the payment of his share of living expenses is diverted to student loan creditors.[14] The debtor concludes that since the family's combined living expenses are high (and Mr. White's entire salary is

**12.** *See In re Crosswhite,* 148 F.3d 879, 889 (7th Cir.1998); *Gamble v. Gamble (In re Gamble),* 143 F.3d 223, 226 (5th Cir.1998); *In re Leonard,* 231 B.R. 884, 888 (E.D.Pa.1999); *Beasley v. Adams (In re Adams),* 200 B.R. 630, 633–634 (N.D.Ill.1996); *Hart v. Molino (In re Molino),* 225 B.R. 904, 910 (6th Cir. BAP 1998); *Turner v. McClain (In re McClain),* 227 B.R. 881, 885–886 (Bankr.S.D.Ind.1998); *Killeen v. Whittaker (In re Whittaker),* 225 B.R. 131, 143–144 (Bankr.E.D.La.1998); *Halper v. Halper (In re Halper),* 213 B.R. 279, 284 (Bankr.D.N.J.1997); *Fitzsimonds v. Haines (In re Haines),* 210 B.R. 586, 590–591 (Bankr. S.D.Cal.1997); *Crossett v. Windom (In re Windom),* 207 B.R. 1017, 1022 (Bankr.W.D.Tenn. 1997); *Duet v. Richards (In re Richards),* 207 B.R. 266, 267 (Bankr.M.D.Fla.1997); *Shellem v. Koons (In re Koons),* 206 B.R. 768, 773 (Bankr.E.D.Pa.1997); *Carlisle v. Carlisle (In re Carlisle),* 205 B.R. 812, 819–820 (Bankr. W.D.La.1997); *Cleveland v. Cleveland (In re Cleveland),* 198 B.R. 394, 398 (Bankr.N.D.Ga. 1996); *Morris v. Morris (In re Morris),* 197 B.R. 236, 244 (Bankr.N.D.W.Va.1996); *Samayoa v. Jodoin (In re Jodoin),* 196 B.R. 845, 855 (Bankr.E.D.Cal.1996), *aff'd,* 209 B.R. 132 (9th Cir. BAP 1997); *Celani v. Celani (In re Celani),* 194 B.R. 719, 721 (Bankr.D.Conn. 1996); *In re Smither,* 194 B.R. 102, 108 (Bankr.W.D.Ky.1996); *Gantz v. Gantz (In re Gantz),* 192 B.R. 932, 936–937 (Bankr.N.D.Ill. 1996); *Hill v. Hill (In re Hill),* 184 B.R. 750, 755 (Bankr.N.D.Ill.1995); *Comisky v. Comisky (In re Comisky),* 183 B.R. 883, 884 (Bankr. N.D.Cal.1995).

**13.** *See In re Kull,* 12 B.R. 654, 659 (S.D.Ga. 1981), *aff'd, Kitchens v. Georgia Railroad Bank & Trust Co. (In re Kitchens),* 702 F.2d 885 (11th Cir.1983); *In re Bottorff,* 232 B.R. 171, 173 (Bankr.W.D.Mo.1999); *In re Sexton,* 230 B.R. 346, 351 (Bankr.E.D.Tenn.1999); *In re Cardillo,* 170 B.R. 490, 492 (Bankr.D.N.H.

1994); *In re Schnabel,* 153 B.R. 809, 818 (Bankr.N.D.Ill.1993); *In re Harmon,* 118 B.R. 68, 69 (Bankr.E.D.Mich.1990); *In re Belt,* 106 B.R. 553, 563 (Bankr.N.D.Ind.1989); *In re Rose,* 101 B.R. 934, 943 (Bankr.S.D.Ohio 1989); *In re Saunders,* 60 B.R. 187, 188 (Bankr.N.D.Ohio 1986); *In re Kern,* 40 B.R. 26, 28–29 (Bankr.S.D.N.Y.1984); *In re Sellers,* 33 B.R. 854, 857 (Bankr.D.Colo.1983).

**14.** The debtor cites, in support of that argument, this Court's opinion in *In re Attanasio,* 218 B.R. 180 (Bankr.N.D.Ala.1998), which involved section 707(b) of the Bankruptcy Code. In that case, this Court determined, among many other things, that, for purposes of making 707(b) determinations, the income of a non-debtor spouse should be considered only to the extent of one-half of actual living expenses. The opinion read in part:

> No legal basis exists in or out of bankruptcy for confiscating the income of a non-debtor for the payment of the debts of a debtor, or for otherwise directing how a non-debtor spends his hard earned cash. Furthermore, section 707(b), according to its plain language, mandates dismissal if granting a debtor relief would be a substantial abuse of Chapter 7, not if the debtor's non-debtor mate could aid and assist a debtor in paying his creditors or shoulder more than his or her share of the family living expenses so that the debtor can pay his debts. Therefore, it is difficult to understand why some bankruptcy courts believe that the appropriate figure to be used in measuring the ability to pay for purposes of 707(b) is the combined income of the debtor and his non-debtor spouse or mate minus combined family living expenses, without regard to how much income each party contributes.

presently consumed by his agreed share of their living expenses) any diversion for the benefit of student loan creditors would penalize Ms. White.

Again, the Court disagrees. The baseline from which to measure is a "minimal lifestyle." The debtor's argument is based on the Whites' actual lifestyle, which is a very comfortable lifestyle, rather than the "minimal" lifestyle envisioned by *Brunner.* What Mr. White's "fair share" of a comfortable lifestyle is not relevant to the *Brunner* equation.[15]

> Of course, a court should assume that each party to a relationship, to the extent of his or her income, shares equally in paying the family living expenses and attribute at least one-half of the family living expenses to the debtor and the other half to the non-debtor spouse. The appropriate measure of the debtor's ability to pay for purposes of 707(b) would then be the debtor's sole income minus his one-half share of the family living expenses, unless of course he is the sole or primary provider for the family unit, in which case all or most of the living expenses must be deducted from his income to determine his ability to pay. A non-debtor should not be forced to shoulder more than his or her half of the family living expenses and a debtor should not be forced to shoulder less than his or her half of the family living expenses.
>
> Congress expressed no intention that 707(b) should effect a non-debtor in any fashion or that any non-debtor should be required to tighten his or her belt in order to assist the debtor in paying his debts. Furthermore, there is no indication that section 707(b) dismissal should depend on the fortuity of who the debtor is married to, whether or not that person works, and what amount that person earns. Therefore, bankruptcy courts should not gerrymander the combined income of a debtor and his mate in a fashion which in effect requires a non-debtor to contribute to the payment of debts which he or she did not incur.

218 B.R. at 234–235.

That analysis is not appropriate here. The standards used for making 707(b) substantial abuse determinations are not readily applied to student loan dischargeability determinations since that section and section 523(a)(8)(B) have no relation to one another and have different purposes. Each must be construed in a manner most likely to effectuate the purpose of that section. And although questions that arise under each statute require an analysis of a debtor's financial circumstances, there is no other similarity.

Unless all debts are considered de facto non-dischargeable, and section 523 is considered mere surplusage, the threshold for Chapter 7 relief under 707(b), as envisioned by Congress, must be less stringent than that required for the discharge of otherwise non-dischargeable debts under 523(a)(8)(B). Section 707(b) addresses a debtor's right to seek the discharge of debts that Congress has said can be discharged. Under section 707(b) the door to bankruptcy is barred only to those whose participation would constitute a substantial abuse. On the other hand, section 523(a)(8)(B) is an avenue around the debts that Congress has mandated *should not* be discharged. That avenue was purposely made difficult and narrow to prevent the discharge of such debts except in extraordinary circumstances.

No "undue hardship" language appears in 707(b), that is, the statute does not require dismissal of a Chapter 7 case unless a debtor cannot repay all of his or her debt without undue hardship. The section 707(b) threshold does not require a minimal lifestyle as the price of a Chapter 7 discharge. On the other hand, section 523(a)(8)(B), according to *Brunner*, requires a minimal lifestyle as the price of the discharge of a student loan. Consequently, a construction of section 523(a)(8)(B) which may place a greater emphasis on the contributions of a non-debtor spouse than is placed on the same contribution under section 707(b), is warranted.

**15.** If the argument has any merit, it must be within the context of determining Mr. and Mrs. White's contributions to the common fund, in relative proportion to their distinct incomes. If Mr. White, after payment of student loan debt, can only contribute $730.89 each month to the common marital fund, should not Ms. White's contribution be three times that amount, or $2,536.50, since her paycheck is more than three times larger than Mr. White's? Taken within that context, the debtor's argument would lead to the same conclusion as that otherwise reached by the Court herein, that is, Mr. White can repay his student loan obligations and afford at least a minimal lifestyle while doing so.

Can anyone seriously argue that Mr. and Mrs. White could not live a relatively comfortable lifestyle on $2,923.56 a month? That figure would result in an annual disposable (after-tax) income of $35,082.72. According to the latest census report, the average disposable personal income per capita in the state of Alabama in 1995 was $16,657. Doubling that figure for a couple in which each spouse earns an income comes to $33,314. Table No. 700, Disposable Personal Income Per

Capita in Current and Constant (1992) Dollars by State: 1980 to 1995, *Statistical Abstract of the United States 1996* 454 (Bureau of the Census, U.S. Dept. of Commerce, 1996). The average annual expenditures, including personal taxes, by consumer units consisting of husbands and wives only was $36,198.00 in 1994. Table No. 706, Average Annual Expenditures of All Consumer Units, by Type of Household Unit: 1994, *Statistical Abstract of the United States 1996* 459 (Bureau of the Census, U.S. Dept. of Commerce, 1996). Using the theoretical pro rata living expense contribution analysis, the Whites would be able to enjoy more or less an average lifestyle even if Mr. White has to repay his student loans.

And even if this Court were to consider only this reduced theoretical figure, rather than the much higher amount that represents the Whites' actual combined income, this Court would find that the Whites' financial condition is so much better than the many whose circumstances warrant discharges of student loans. The reported cases demonstrate this enormous difference. See *United Student Aid Funds, Inc. v. Pena (In re Pena)*, 155 F.3d 1108 (9th Cir.1998) (1 child; $1,748 monthly income; $9,000 student loans); *Cheesman v. Tennessee Student Assistance Corp. (In re Cheesman)*, 25 F.3d 356 (6th Cir.1994) (2 children; $1,143 monthly income; $14,000 student loans), *cert. denied*, 513 U.S. 1081, 115 S.Ct. 731, 130 L.Ed.2d 634 (1995); *Brown v. Salliemae Servicing Corp. (In re Brown)*, 227 B.R. 540 (Bankr. S.D.Cal.1998) (2 children; paying $404 a month in additional child support; $3,561 in monthly income; $96,000 in student loan debt); *Lebovits v. Chase Manhattan Bank (In re Lebovits)*, 223 B.R. 265 (Bankr.E.D.N.Y. 1998) (7 children; $4,700 monthly income; $40,000 in student loans); *Rose v. United States Department of Educ. (In re Rose)*, 215 B.R. 755 (Bankr.W.D.Mo.1997) (2 children; $1,750 in monthly income; $105,000 in student loan debt), *aff'd in part and remanded in part*, 227 B.R. 518 (W.D.Mo.1998), *aff'd in part and remanded in part*, 187 F.3d 926 (8th Cir.1999); *Coats v. New Jersey Higher Educ. Assistance Auth. (In re Coats)*, 214 B.R. 397 (Bankr.N.D.Okla.1997) (3 children; $4,218 monthly income, including social security and child support; $39,000 student loans); *Hornsby v. Tennessee Student Assistance Corp. (In re Hornsby)*, 201 B.R. 195 (Bankr. W.D.Tenn.1995) (3 children; $2,556 in monthly income; $33,000 in student loan debt), *rev'd*, 144 F.3d 433 (6th Cir.1998); *Derby v. Student Loan Servs. (In re Derby)*, 199 B.R. 328 (Bankr.W.D.Pa.1996) (2 children; $500 in monthly income; $17,000 in student loan debt); *Taylor v. Illinois Student Assistance Comm'n (In re Taylor)*, 198 B.R. 700 (Bankr.N.D.Ohio 1996) ($1,083 monthly income; $34,000 student loans); *Harris v. Unipac Serv. Corp. (In re Harris)*, 198 B.R. 190 (Bankr.W.D.Va.1996) (2 children; $2,480 monthly income; $50,000 student loans); *Skaggs v. Great Lakes Higher Educ. Corp. (In re Skaggs)*, 196 B.R. 865 (Bankr.W.D.Okla. 1996) (3 children; $3,000 monthly income; $47,000 student loans); *Vazquez v. United Student Aid Funds, Inc. (In re Vazquez)*, 194 B.R. 677 (Bankr.S.D.Fla.1996) (1 child; $915 monthly income, all from social security and welfare; $7,000 student loan); *Dillon v. Virginia State Educ. Auth. (In re Dillon)*, 191 B.R. 658 (Bankr.W.D.Va.1994) (2 children; $1,192 monthly income), *rev'd*, 189 B.R. 382 (W.D.Va.1995); *Elebrashy v. Student Loan Corp. (In re Elebrashy)*, 189 B.R. 922 (Bankr. N.D.Ohio 1995) ($1,213 monthly income; $77,000 student loans); *Pichardo v. United Student Aid Funds, Inc. (In re Pichardo)*, 186 B.R. 279 (Bankr.M.D.Fla.1995) ($578 monthly income; $10,000 student loans); *Goranson v. Pennsylvania Higher Educ. Assistance Agency (In re Goranson)*, 183 B.R. 52 (Bankr. W.D.N.Y.1995) (2 children; $1,250 monthly income; $23,000 student loans); *Lindberg v. American Credit and Collection, Student Loan Servicing Center (In re Lindberg)*, 170 B.R. 462 (Bankr.D.Kan.1994) (4 children; $1,500 monthly income, including food stamps; $10,000 student loans); *Cooper v. Nebraska Student Loan Program, Inc. (In re Cooper)*, 167 B.R. 966 (Bankr.D.Kan.1994) (3 children; $2,600 monthly income; $8,000 student loans); *Sallie Mae v. Plotkin (In re Plotkin)*, 164 B.R. 623 (Bankr.W.D.Ark.1994) ($466 monthly income, all from social security disability payments; $7,000 student loans); *Correll v. Union Nat'l Bank of Pittsburg (In re Correll)*, 105 B.R. 302 (Bankr.W.D.Pa.1989) (3 cases) (1 child; $896 in monthly income; and $3,000 in student loans) ($250 monthly income plus food stamps and public assistance; $2,000 in student loans) (4 children; $1,693 monthly income; $2,000 in student loans); *Zobel v. Iowa College Aid Comm'n (In re Zobel)*, 80 B.R. 950 (Bankr.N.D.Iowa 1986) (2 children; $700 monthly income, all from public assistance; $2,000 student loans); *Kincaid v. ITT Educ. Servs., Inc. (In re Kincaid)*, 70 B.R. 188 (Bankr.W.D.Mo.1986) (2 children; $ 4,000 student loan debt); *Turner v. Detroit and Northern Savings (In re Turner)*, 69 B.R. 62 (Bankr.D.Minn.1986) (4 children; $1,200 monthly income; $27,000 student loan); *Wilcox v. United States (In re Wilcox)*, 57 B.R. 479 (Bankr.M.D.Ga.1985) ($640 monthly income; $2,000 student loans); *Feenstra v. New York State Higher Educ. Servs. Corp. (In re Feenstra)*, 51 B.R. 107 (Bankr. W.D.N.Y.1985) (4 children; $1,664 in monthly income; $2,000 in student loan debt);

■ The Bankruptcy Code requires this Court to determine only a debtor's actual standard of living and what adverse impact, if any, repayment by the debtor of his or her student loan obligations will have on that standard of living, and whether that impact will cause that standard to drop below a minimal lifestyle. In this case, the debtor's standard of living, both quantitatively and qualitatively, is good. He and his wife, according to the figures supplied by the debtor, have a net income of approximately $6,200.00 each month and spend only $4,737.24 on monthly "living expenses." They live in a nice home and drive relatively new and expensive automobiles. They can afford to eat well and wear decent clothing. They can afford to pay their utility bills and maintain their home. They can afford to have adequate life, health, and automobile insurance. They do not appear to want for any necessities or for many of the conveniences of modern life. And, they have substantial discretionary money left over each month to set aside for household projects, savings, investments or recreation. The slight change in this actual lifestyle that will be caused by requiring the debtor to pay his student loans could never be considered equal to a similar change that might force a much less fortunate debtor below a "minimal" lifestyle.

## VI. Conclusion

In regard to the general issue of dischargeability, while payment of Mr. White's student loan obligations will intrude into the Whites' discretionary income, that payment will have no significant impact on Mr. White's current lifestyle, which is far, far above the "minimal" required to meet the *Brunner* test. And repayment by Mr. White of his student loan obligations, under his present circumstances, will present no significant hardship to either him or his wife, much less an undue hardship.

In regard to the motions for summary judgment, the defendants have proven that there is no evidence to support Mr. White's claim of undue hardship. The facts contained in the parties' joint stipulation affirmatively demonstrate that Mr. White will be unable to prove his undue hardship claim at trial. Summary judgment must accordingly be granted in favor of the defendants, the United States Department of Education and the Nebraska Student Loan Program.

In regard to the ultimate issue, this Court must conclude that the debts owed to the movant-defendants may not be excepted from the prohibition against discharge provided for in 11 U.S.C. § 523(a)(8).

*Washington v. Virginia State Educ. Assistance Auth. (In re Washington)*, 41 B.R. 211 (Bankr. E.D.Va.1984) (1 child; $800 in monthly income; and $7,000 in student loans); *Bennett v. Commerce Bank of Independence (In re Bennett)*, 38 B.R. 392 (Bankr.W.D.Mo.1984) (4 children; $697 monthly income; $7,000 student loans); *Dockery v. Merchants & Planters Bank (In re Dockery)*, 36 B.R. 41 (Bankr. E.D.Tenn.1984) (2 children; living on social security disability benefits; $5,000 student loans); *Dresser v. University of Maine (In re Dresser)*, 33 B.R. 63 (Bankr.D.Me.1983) (paying $80 month child support; $1,000 monthly income; $24,000 student loans); *Carter v. Kent State Univ. (In re Carter)*, 29 B.R. 228 (Bankr.N.D.Ohio 1983) (4 children; $1,238 monthly income; $9,000 student loans); *Siebert v. United States Dep't of Health, Educ. and Welfare (In re Siebert)*, 10 B.R. 704 (Bankr.S.D.Ohio 1981) (2 children; $443 monthly income).